HYUNG JIN KIM
901 Mission Street, Suite 105
San Francisco, CA 94103
State Bar No: 183109
Telephone:(415)366 - 5862
Facsimile: (415) 599-2706
intercle@gmail.com

Attorney for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HEE NAM YOU

AND

KYUNG SOON KIM  for                )      CASE NO.:  3:15-CV-03257
    Themselves and On Behalf     )
    Of All Others Similarly          )
        Situated                )      **CLASS ACTION COMPLAINT**
                        )
               Plaintiffs,   )
    VS.                              )
                        )      **DEMAND FOR TRIAL**
JAPAN, HIROHITO, AKIHITO       )      **BY JURY**
NOBUSKE KISHI, SHINZO ABE,     )
NYK LINE (NORTH AMERICA),      )
NIPPON YUSEN KABUSHIKI         )
KAISHA,NISSAN MOTOR CO.,       )
LTD, NISSAN NORTH AMERICA, )
INC.,TOYOTA MOTOR              )
CORPORATION, TOYOTA            )
MOTOR SALES, U.S.A., INC.       )

1

HITACHI, LTD,   HITACHI                )
AMERICA, LTD.  NIPPON STEEL            )
& SUMITOMO METAL U.S.A.,               )
INC. NIPPON STEEL &                    )
SUMITOMO METAL                         )
CORPORATION, MITSUBISHI                )
CORPORATION (AMERICA)                  )
MITSUBISHI GROUP,MITSUI &              )
CO. (U.S.A.), INC., MITSUI GROUP,)
OKAMOTO INDUSTRIES, , INC.            )
SANKEI SHIMBUN, CO LTD. and            )
DOES 1-1000,      inclusive            )
                                       )
                  Defendants  )
-------------------------------------------------

HEE NAM YOU (hereinafter "Plaintiff YOU")  and KYUNG SOON

KIM (hereinafter "Plaintiff KIM"), for themselves and on behalf of all others

similarly situated including Jane and John Does(collectively referred to as

"Plaintiffs"), allege against Defendants (1) JAPAN, (2) HIROHITO, (3)

AKIHITO, (4) NOBUSKE KISHI, (5) SHINZO ABE, (6) NYK LINE

(NORTH AMERICA), (7) NIPPON YUSEN KABUSHIKI KAISHA, (8)

NISSAN MOTOR CO., LTD, (9) NISSAN NORTH AMERICA, INC., (10)

TOYOTA MOTOR CORPORATION, (11) TOYOTA MOTOR SALES,

U.S.A. INC., (12) HITACHI, LTD,   (13) HITACHI AMERICA, LTD., (14)

NIPPON STEEL & SUMITOMO METAL U.S.A. INC., (15) NIPPON

STEEL & SUMITOMO METAL CORPORATION, (16) MITSUBISHI

CORPORATION (AMERICA), MITSUBISHI GROUP,(17) MITSUI & CO.

(U.S.A.), INC., (18) MITSUI GROUP,(19) OKAMOTO INDUSTRIES, ,

INC., (20) SANKEI SHIMBUN, CO LTD. and (20) DOES 1-1000,

(collectively referred to as "Defendants"), as follows:

# **INTRODUCTION**

1. This case is about one of the most tragic crimes of so-called "sex slavery" in the modern history of humankind. More than 200,000 young women in occupied Asian and Pacific territories were abducted or defrauded by the Japanese government before and during World War II (hereafter the "War"). Many of those young women, mostly from Korea, were forced into servitude and exploited as sex slaves throughout Asia and Pacific for the pleasure and benefit of Japanese soldiers, becoming victims of the largest case of human trafficking in the 20th century.

2. During the period between 1931 and 1945, Defendant Japan kidnapped, abducted, forced or defrauded Plaintiffs for the purpose of making Plaintiffs so-called "sex slaves" a.k.a. "comfort women" for the benefit of Japanese military forces in and out of territory of Japan.

3. Plaintiff  YOU and many victims were legal minors when they were abducted, deceived or taken by force. The Plaintiffs were forced to be sex slaves against their wills in so-called "comfort stations."

4. In the comfort stations, Plaintiffs were routinely detained, tortured, raped, beaten, mutilated, abused, and in some cases, murdered by Japanese soldiers, police persons, officials or agents before, during, and after the War.

5. As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have been subjected to severe physical and psychological damages, pain and suffering and have incurred huge expenses and suffered damages. These injuries have caused and will continue to cause Plaintiffs great physical and mental loss, pain and suffering.

6. The reason for not joining all potential class members as Plaintiffs as of now is that, upon information and belief, there are thousands of

potential plaintiffs making it impractical to bring them before the Court.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the claims and causes of action described herein pursuant to 28 U.S.C. § 1350.

8. Plaintiffs have been injured, and are likely to continue to be injured, as a direct result of Defendant's unlawful conduct.

9. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and based on the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, for the alleged violations of international human rights law. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

10. This Court has subject matter jurisdiction over the claims and causes of action described herein pursuant to 28 U.S.C. § 1391 (f) and 28 U.S.C. § 1331.

11. This Court has subject matter jurisdiction because this Court has stated that the ATCA both confers federal subject matter jurisdiction and creates an independent cause of action for violations of treaties or the law of nations.[1]

12. Further, this Court has subject matter jurisdiction over the claims and causes of action described herein because the principle of universal jurisdiction.

---

[1] See In re Estate of Ferdinand Marcos, Human Rights Litigation, 25 F.3d 1467, 1475–76 (9th Cir.1994). See also, Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 444–45 (D.N.J.1999) (concluding that plaintiff had stated a claim under the ATCA since "deportation of civilian populations to slave labor is a war crime").

4

13. This Court also possesses federal-question jurisdiction under 28 U.S.C. § 1331, because Plaintiffs' claims involve substantial international law and federal questions, and because Plaintiffs' claims arise under customary international law, enforceable in this Court as federal common law.

14. This Court has subject matter jurisdiction because the Alien Tort Statute (ATS) provides jurisdiction over cases involving various forms of official or state sponsored torture, genocide, war crimes, crimes against humanity, as well as forced labor, servitude, or slavery.[2]

15. Venue is proper in the Northern District of California because Defendants such as TOYOTA are subject to personal jurisdiction in this district, and the allegations described in this Complaint did not take place in any one judicial district.[3]

16. This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(a) and 28 U.S.C. § 1331. Venue is proper in this forum pursuant to 18 U.S.C. § 1965(a) & (b), and 28 U.S.C. § 1391(a) & (b). Venue and personal jurisdiction is proper under section 1965(a) because Defendants reside, are found, have an agent, or transact their affairs in this District. Venue and personal jurisdiction is also proper under § 1965(b) in this forum because the ends of justice require that any Defendant residing in another District be brought before this Court. Venue is also proper under § 1391(a) & (b) in that a substantial part of the events or omissions giving rise to the claim occurred in this District. Further, venue is proper under principles of pendent venue because all claims arise out of the same nucleus of operative facts

---

[2] 28 U.S.C.A. § 1350.

[3] 28 U.S.C. § 1391(b)(3).

17. This Court has jurisdiction over Defendant JAPAN  because it is active in the United States, does business throughout the United States, including California, has registered agents in the United States, including California, and may be found in the United States, including California.

18. This Court has jurisdiction over Defendant SANKEI SHIMBUN, CO LTD. because it is active and present in the United States, does business throughout the United States, including State of California, has registered agents in the United States, including California, and  may be found in the United States, including California.

## **PLAINTIFFS**

19. Plaintiff  YOU is a citizen of Republic of Korea and resides in Gwangju, Korea. She was born in 1928 in Korea.

20. Plaintiff  KIM is a citizen of Republic of Korea and resides in Seoul, Korea. She was born in 1926 in Korea.

21. Korea was, as a colony, occupied and ruled by Japanese government between 1910-1945.

22. On August 1943, at the age of fifteen, Plaintiff YOU was kidnapped on the street of her home town Sunjang in Korea by a policeman of Japanese government for no reason. Then she was, by force, transported to Japan and, for next two years, was forced to be a sex slave for Japanese soldiers.

23. Plaintiffs Jane and John Does are either the victims of or the legal heirs to victims of the nonconsensual atrocities that Defendants conducted in Asia during the period of World War II.

24. Plaintiff  YOU and Plaintiff  KIM, now living in Korea are innocent civilian victims of the atrocities. They seek justice under the

international laws and United States law for the damages they and others like them suffered because of Defendants' intentional conducts to commit those wrongful conducts.

25. Plaintiffs not specified yet herein are either citizens or residents of Peoples' Republic of China, and other Asian countries or United States of America.

## **DEFENDANTS**

26. Defendants JAPAN, HIROHITO, AKIHITO, NOBUSKE KISHI, SHINZO ABE, NYK LINE (NORTH AMERICA), NIPPON YUSEN KABUSHIKI KAISHA,NISSAN MOTOR CO., LTD, NISSAN NORTH AMERICA, INC.,TOYOTA MOTOR CORPORATION, TOYATA MOTOR SALES, U.S.A. INC., HITACHI, LTD,   HITACHI AMERICA, LTD., NIPPON STEEL & SUMITOMO METAL U.S.A. INC., NIPPON STEEL & SUMITOMO METAL CORPORATION, MITSUBISHI CORPORATION (AMERICA), MITSUBISHI GROUP, MITSUI & CO. (U.S.A.), INC., MITSUI GROUP,OKAMOTO INDUSTRIES, , INC., SANKEI SHIMBUN, CO LTD. and DOES 1-1000 broke the law regarding unlawful wrongdoings committed against people in Asia during the War.

27. Defendants JAPAN, HIROHITO, NOBUSKE KISHI, NYK LINE (NORTH AMERICA), NIPPON YUSEN KABUSHIKI KAISHA,NISSAN MOTOR CO., LTD, NISSAN NORTH AMERICA, INC.,TOYOTA MOTOR CORPORATION, TOYATA MOTOR SALES, U.S.A. INC., HITACHI, LTD, HITACHI AMERICA, LTD., NIPPON STEEL & SUMITOMO METAL U.S.A. INC., NIPPON STEEL & SUMITOMO METAL CORPORATION, MITSUBISHI CORPORATION (AMERICA), MITSUBISHI GROUP, MITSUI & CO. (U.S.A.), INC., MITSUI

GROUP,OKAMOTO INDUSTRIES, , INC., are hereinafter referred to as "Wartime Defendants.

28. Defendants NYK LINE (NORTH AMERICA), NIPPON YUSEN KABUSHIKI KAISHA,NISSAN MOTOR CO., LTD, NISSAN NORTH AMERICA, INC.,TOYOTA MOTOR CORPORATION, TOYATA MOTOR SALES, U.S.A. INC., HITACHI, LTD,   HITACHI AMERICA, LTD., NIPPON STEEL & SUMITOMO METAL U.S.A. INC., NIPPON STEEL & SUMITOMO METAL CORPORATION, MITSUBISHI CORPORATION (AMERICA), MITSUBISHI GROUP, MITSUI & CO. (U.S.A.), INC., MITSUI GROUP,OKAMOTO INDUSTRIES, , INC., are hereinafter referred to as "Corporation Defendants" .

29. Defendants HIROHITO, NOBUSKE KISHI are referred collectively as "Individual Defendants" hereinafter.

30. Wartime Defendants either (1) planed, commissioned, conspired, or performed the atrocities, or (2) committed tort against Plaintiffs breaking or violating both domestic and international law.

31. Defendant JAPAN enslaved and perpetrated atrocities upon the Plaintiff during the 1940-1945 periods in violation of international and domestic laws.[4]During the 1931-1945 period, the Japanese government violated numerous international treaties which protected civilians in military-occupied territories and prohibit trafficking in persons such as the Hague Convention. After all, Japanese government  itself  admitted that Japan's

---

[4] In 2007, The House of Representatives passed Resolution 121 where founds that Japanese government is liable for the sex slave issue. H.R. Res. 121, 110th Cong. (2007).

military played at least an indirect role in forcing the so-called comfort women to provide sex to Japanese soldiers.[5]

32. Nevertheless, Defendant JAPAN has consistently denied any legal liability on this issue in the lawsuits filed by victims from around the world since 1991.

33. Section 1605(a)(2) of the Foreign Sovereign Immunity Act provides that a foreign sovereign and its agencies and instrumentalities: "...shall not be immune from the jurisdiction of the courts of the United States or of the States in any case ... in which the action is based ... upon an act outside the territory of the United States **in connection with a commercial activity of the foreign sovereign elsewhere and that act causes a direct effect in the United States**." (Emphasis added). The "commercial activity" is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act."[6]

34. In the present case, the conduct of Japanese soldiers who raped the detained Plaintiffs and others like them had a direct effect in the United States in that the Japanese government established and operated those "comfort stations" for the benefit of the Japanese government as well as Japanese soldiers at war with Allies including the U.S. Japanese soldiers engaged in commercial activity in the buying and selling the right to rape Plaintiffs. Also, those same soldiers attacked and sank numerous naval vessels as well as commercial vessels of the U.S. in the Pacific Ocean during the War. **Therefore, Wartime Defendants' conduct severely and direct affects commercial effect in the United States.**

---

[5] Sterngold, James (5 August 1993). *"Japan Admits Army Forced Women Into War Brothels"*. The New York Times.p.2.Retrieved 26 February 2014.
[6] 28 U.S.C. § 1603(d).

35. Defendant SHINZO ABE ("Defendant ABE") is one of the legal heirs of the assets of Defendant NOBUSKE KISHI ("Defendant KISHI"), a deceased former Minister of Munitions under HideKi Tojo, a former prime minister of  so-called Japanese Empire and also a "Class A" war criminal held in prison after the War by the order of the Supreme Commander of the Allied Powers continues to deny the governmental commission by Japanese government in the process. Before the end of the War, NOBUSKE KISHI was serving as an official in many branches of so-called Japanese Empire including Ministry of Commerce and Industry and Manchukuo. Especially, during the era of 1941-1944, he was directly responsible for waging war against Allies as the Minister of Munition; he was also responsible for all the atrocities occurred to the Plaintiffs as a member of cabinet of so-called Imperial government of Japanese. In addition, Defendant ABE is personally liable for defamation and intentional infliction of emotional distress against Plaintiffs as explained in detail below.

36. Defendant HIROHITO was so-called the king of Japan during the Second World War. HIROHITO is legally and practically responsible for all the war crimes and atrocities committed by Japanese military forces during the War as a ruler and military leader of the nation as much as Hitler is responsible for those atrocities committed under the Nazi rules based on the legal principles such as command responsibility.

37. Defendant AKIHITO is one of the legal heirs of the assets of late Defendant HIROHITO, a former king of Japan.

38. Plaintiffs are entitled to recover damages from the assets of Defendant AKIHITO as long as the assets were inherited to Defendant AKIHITO from Defendant HIROHITO.

10

39. Defendant NYK LINE (NORTH AMERICA) is subsidiary of Defendant NIPPON YUSEN KABUSHIKI KAISHA a.k.a. NYK LINE. NIPPON YUSEN KABUSHIKI KAISHA has been in shipping business since 1870 in Japan providing service to the maritime transportation service between Korea and Japan during the period of 1941-1945. In the present case, the plaintiffs were transported in the vessel manufactured and sold by Defendant NIPPON YUSEN KABUSHIKI KAISHA. By continuously providing this type of transportation service between Korea and Japan or between Japan and other Asian countries to Japanese government for profit, the Defendant NIPPON YUSEN KABUSHIKI KAISHA not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

40. Defendant NISSAN NORTH AMERICA, INC., is a U.S. subsidiary of Defendant NISSAN MOTOR CO., LTD ("NISSAN"). NISSAN has been in the business of manufacturing and sales of motor vehicles in Japan since 1911. Ever since their initial periods, Defendants NISSAN provided and sold motor vehicles including many types of trucks to Japanese government for military and civil uses especially during the period of War. In the present case, the Plaintiffs were transported in the vessel and truck manufactured and sold by Defendant NISSAN to Japanese government. By doing so, Defendant NISSAN not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

41. Defendant TOYATA MOTOR SALES, U.S.A., INC. is a U.S. subsidiary of Defendant TOYOTA MOTOR CORPORATION

("TOYATA"). TOYOTA has been in the business of manufacturing and sales of motor vehicles in Japan since 1933. Ever since their initial periods, Defendant TOYOTA provided and sold vehicles including many types of trucks to Japanese government during the War. In the present case, the Plaintiffs were transported in the vessel and truck manufactured and sold by Defendant TOYOTA to Japanese government. By doing so, Defendant TOYOTA not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

42. Defendant HITACHI AMERICA, LTD. is a U.S. subsidiary of Defendant HITACHI, LTD. ("HITACHI"). HITACHI has been in the business of manufacturing and sales of commercial products such as locomotives, transformer as well as military arms including guns and rifles since 1910. During the War, Defendant HITACHI provided and sold such products to Japanese government during the period so that it could continue the atrocities to the Plaintiffs. In the present case, the plaintiffs were transported in the train and vessel which included the products such as locomotives and engine manufactured and sold by Defendant HITACHI. By doing so, Defendant HITACHI not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

43. Defendant NIPPON STEEL & SUMITOMO METAL U.S.A., INC. is a U.S. subsidiary of Defendant NIPPON STEEL & SUMITOMO METAL CORPORATION ("NIPPON STEEL"). NIPPON STEEL, a. k. a SHIN NIPPON SEITETSU KK has been in the business of producing and sales of steel products since 1896. During the War, Defendant NIPPON STEEL

provided and sold such steel products to Japanese government during the period so that it could continue the atrocities to the Plaintiffs. In the present case, the Plaintiffs were transported in the train and vessel made of steel products manufactured and sold by Defendant NIPPON STEEL. By doing so, Defendant NIPPON STEEL not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

44. Defendant MITSUBISHI CORPORATION (AMERICA) is a U.S. subsidiary of Defendant MITSUBISHI GROUP, including MITSUBISHI BANK, MITSUBISHI CORPORATION, MITSUBISHI HEAVY INDUSTRIES, and MITSUBISHI MOTORS ("MITSUBISHI"). MITSUBISHI has been in many business areas including financial industry, international trade, ship building industry and automotive industry since 1870. During the period of the War, Defendant MITSUBISHI provided or sold products such as financial support, vessels, trucks, ammunitions and other arms to Japanese government during the period so that it could wage the War continuing the atrocities to the Plaintiffs. In the present case, the Plaintiffs were transported in the train and vessel manufactured and sold by Defendant MITSUBISHI. By doing so, Defendant MITSUBISHI not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

45. Defendant MITSUI & CO. (U.S.A.), INC. is a U.S. subsidiary of Defendant MITSUI GROUP including SUMITOMO MITUI BANKING CORPORATION, SAPPORO BREWERIES AND MITUI O.S.K. LINES ("MITSUI"). MITSUI has been in many business areas including financial

industry, international trade, ship building industry and automotive industry since 1876. During the period of the War, Defendant MITSUI provided or sold products such as financial support, vessels, trucks, ammunitions and other arms to Japanese government during the War period so that it could wage the War continuing the atrocities to the Plaintiffs. In the present case, the plaintiffs were transported in the train and vessel manufactured and sold by Defendant. By doing so, Defendant MITSUI not only willfully and wrongfully realized huge profit from the transactions which facilitated the atrocities but purposefully and intentionally conspired to and participated in these atrocities against Plaintiffs.

46. This Courts properly have jurisdiction over headquarters of Corporation Defendants as well as their U.S. subsidiaries because claims brought against the headquarters in Japan have been dismissed or lost by the country's highest court, foreclosing all actions against the Corporation Defendants for the restitution of property or payment of reparations.

47. Defendant OKAMOTO INDUSTRIES, INC., formerly known as OKAMOTO RUBBER CO., LTD, is a Japanese company which have manufactured, sold and distributed a male contraceptive product, i.e. condoms in Japan since 1934. 48. Especially, throughout the War, Defendant OKAMOTO provided the condoms to Japanese government for military purpose so that soldiers used their products while raping the Plaintiffs in the present case.

49. Defendant SANKEI SHIMBUN, CO LTD. ("Defendant SANKEI") is one of the largest media company in Japan publishing, displaying and transmitting news and commentaries by newspapers and magazines both on-line and off-line media. Defendant SANKEI has purposefully made false arguments that arguments on sex slavery were not true and Plaintiffs were in

fact "voluntary prostitutes" who exchanged sex for money. Further, Defendant SANKEI insists that Plaintiffs participated in the "sexual atrocities" voluntarily and no threat or coercion was used by third parties including Japanese government against Plaintiffs. By making, spreading, and maintaining those assertions, Defendant SANKEI not only willfully and wrongfully defaming Plaintiffs but the accusation of "prostitution" is inflicting severe mental, emotional and physical damages to Plaintiffs.

50. By consistently making, spreading, and maintaining those false arguments throughout the world, Defendant SANKEI have realized and gained huge profit by way of revenue from advertising and readership increase.

51. None of these Defendant ABE and Defendant AKIHITO, enjoys immunity for the acts committed by their predecessor office-holders. Those predecessor office-holders implemented a systemic policy or program that, as set forth below, violated clearly-established rights protected by international laws as well as the U.S. Constitution. In addition to being ethically unsound, this policy, institution or program of war-time sex slavery was facially unconstitutional. The predecessor office-holders, Japan's top officials, knew of the ethical and constitutional violations inherent to non-consensual sex slavery. Regardless of what motivated the predecessor office-holders to create, authorize, supervise, and enforce the war-time sex slavery in contravention of the Fifth and Eighth Amendments, their motivations do not presumptively immunize the program or them, the Japan's monarch and other top officials, and others implementing and executing it, from complying with the rule of law.

52. Defendants DOES One through One Thousand, inclusive, are either  (1) previous high-ranking officials of the Japanese Empire or estate of

the officials who joined in the conspiracy, or otherwise planned and executed, the atrocities against Plaintiffs, (2) corporations which joined in the conspiracy, or otherwise aided, abetted, planned or executed the atrocities against Plaintiffs, or (3) persons or legal entities which committed or are committing torts against Plaintiffs. Plaintiffs will amend this complaint by inserting their true names and capacities herein. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those Defendants. Defendants Does One through One Thousand, inclusive, are sued for damages in their individual capacity.

## FACTS CONCERNING WAR-TIME SEX SLAVERY

53. The present case asks the Court to examine the absolute depths of human existence, from the evils of aggression to institutional slavery and genocide.

54. There are striking similarities between the background of the holocaust against Jewish people which was deplored as one of the worst ever human rights violations so far, and the war-time sex slavery at issue in the present case.

55. The victims of this atrocity were systemically and officially kidnapped on the street of their home town by policemen or defrauded by official activities of Japanese government and were forced to be sex slaves against victims' will and without any legal basis at all.

56. When the kidnapping of Plaintiffs occurred on a massive scale in Korea, Korea, as a colony of the Japanese Empire, was under military rule of the Japanese Empire. The Cairo Communiqué of 1943 correctly defined the situation of Korea under Japanese rule as follows: "The aforesaid three great

16

powers, mindful of the enslavement of the people of Korea, are determined that in due course Korea shall become free and independent.[7]"

57. As of 1943, there was widespread concern amongst the Korean people that Japanese officials were kidnapping young Korean women on streets for sexual pleasure of Japanese soldiers on front.

58. Though she tried to prevent this kind of tragedy by staying away from her home, Plaintiff YOU, was unfortunate to be captured by a policeman in his formal uniform with red-colored rank insignia and police cap with red-colored stripes while she briefly visited her parents' houseat the end of August 1943.

59. After the capture, she was forced to stay overnight at the nearby police substation located at Kundeok-Ri, her hometown against her desperate and tearful struggle to be freed, plea and opposition, and without any opportunity to contact her family members or relatives and without any explanations of the situation.

60. Instead, Plaintiff YOU was told that she would be incarcerated for a long time or even executed instantly if she continued to refuse to follow the order from the police or try to escape. Under extreme fear and despair, Plaintiff YOU had to follow the orders.

61. The next day, Plaintiff YOU had to walk about two (2) miles to Dogo, a nearby town with railway station escorted by an unidentified local policeman armed with pistol from Kundeok-Ri substation. There, the policeman forced her to take a train bound for Chunan, a bigger town in the Province with him.

---

[7] United States Department of State / *Foreign relations of the United States diplomatic papers, The Conferences at Cairo and Tehran, 1943,* http://digital.library.wisc.edu/1711.dl/FRUS.FRUS1943CairoTehran.

62. When they arrived in Chunan, the policeman and Plaintiff YOU had to change the train to Daejun city. It was already dark when they arrived in the station in Daejun city. The policeman took her to a small pub near the station. There she was fed with one bowl of rice soup for a meal.

63. After the meal, the policeman took her back to station. There other seven (7) young girls joined Plaintiff YOU, they were forced to take a train for Busan city.

64. They arrived in Busan station in city of Busan in the next morning. There in Busan, the young women were handed over to another policeman. There was a military truck waiting for them outside of Busan station. There, the women were transported to a port. At Busan port, the women were given a small amount of Kimchi, a fermented vegetables, and rice as breakfast.

65. After the breakfast, policeman checked name of each women and directed them to aboard a liner at the port.

66. During the shipment, the women were locked in a small cabin room with a approximate size of seven hundred (700) square feet, and with a floor of tatami, a rice straw mat.

67. Throughout the maritime transportation, the crew wrapped the indoor lights with cloths as a method of  blackout. The liner sailed whole night. During the transportation, at all times, Plaintiff YOU and other women from Korea were detained and watched in a small cabin by many officials from government of Japan

68. Next morning, the liner with Plaintiff YOU and other women arrived in a port of Shimonoseki, Japan.

69. Throughout this forced transportation to Japan, all and every administrative process including preparing and presenting paperwork to

leave Korean and enter Japan was done by accompanying officials on behalf of Plaintiff YOU and other women.

70. After they were transported to a military base near the port of Shimonoseki heavily guarded by soldiers armed with rifles by military trucks from the port of Shimonoseki with the Japanese officials, the women were interned in a concentration camp ("comfort station") with multiple military tents inside of a large military base with armed guards and barbed-wire fences.

71. When they arrived in the camp, a military person with high rank told them not to flee or escape, not to complain and to obey any order. The Plaintiffs were specifically warned that any minor deviation from the strict rules or order from the "officials" would be severely punished. In fact, the punishment included severe beating, hunger or even instant executions.

72. There, Plaintiff YOU and other women were provided with one small rice roll with dried seaweed for the day's meal. Then they were told to take off all the clothes and take a bath in a group bathroom in the camp. When they finished the bathing, they are given "mompei pants," a loose work pants for women in Japan. The mompei pants were, in fact, the women's only cloth and uniform to be worn day and night until they were finally released from this sex slave camp after the War.

73. Form the very next day, Plaintiff YOU and other women were, on a daily basis, beaten or threatened by "officials" and especially forced to have sexual intercourse with Japanese soldiers in the number of five to thirty times in a day in allocated cubicles measuring approximately three-by-five feet. These atrocities continued every day, seven days a week, 365 days a year regardless of women's physical or emotional conditions or intent.

74. The women were NOT compensated at all for the slavery.[8] Plaintiff  YOU and other women were only provided soap or salt and "Okamoto" condoms in relation to such daily rape but even simple amenities such as spoon and stove were not provided. The women had to endure casual rape and beating only to survive.

75. Likewise, other Plaintiffs including Plaintiff KIM were, after being either kidnapped, abducted, defrauded or taken by force by either employees or agents of Defendant JAPAN from occupied territories around Asia and Pacific islands, transported to "comfort stations" established throughout the occupied territories of Defendant JAPAN.

76. Throughout the period of the forced internment at comfort stations, Plaintiffs were routinely beaten, raped, tortured, mutilated and they could not go out of the camp at any time and no medical treatment, heating, or any kind of electricity was available to any person. The women were denied proper medical attention, shelter, and nutrition. Even when they got sick, the rape did not stop even for a day.

77.  Further, Plaintiffs were routinely beaten, tortured, mutilated and/or threatened in order to prevent them from escaping from the comfort stations.

78. Throughout the period of the forced internment at comfort stations, Plaintiffs were given inadequate food, were forced to sleep in tightly-packed locked rooms, and were constantly threatened with being executed unless they follow the strict orders from the guards.

---

[8] "The use of unpaid, forced labor during World War II violated clearly established norms of international law."*Iwanowa v. Ford Motor Co.,* 67 FSupp2d 424, 440 (D.N.J. 1999).

79. It is estimated that only 25% to 35% of the sex slaves survived the War and those who did suffered severe health effects including permanent damages to their reproductive organs and urinary tracts from various physical abuse and sexually transmitted diseases.

80. The comfort stations were established, managed and controlled by Japanese military. Armed soldiers were guarding the camp all the time and military roll calls were performed against the women by armed guards every morning at five-thirty o'clock to prevent escape.

81. After almost two years of slavery, in the summer of 1945, Plaintiff YOU and other women were, for unknown reason, transported to city of Osaka. There they were told to be shipped to foreign country. The women were forced to continue the sex slavery to soldiers while they were in Osaka until they were freed to return to Korea in September 1945even after the official surrender of Japanese government.

82. Likewise, Plaintiff KIM was forced to live as a sex slave against her will when she was only eighteen year old. She had to suffer both physical and emotional atrocities from Japanese soldiers and officials throughout the period of slavery.

83.  Ever since Plaintiff YOU and Plaintiff KIM returned to Korea after the War in 1945, they has been suffering a significant level of physical and emotional distress due to the horrible atrocities and experiences during the internment period.

84. Other Plaintiffs who survived War were released from the comfort stations after the surrender of Defendant JAPAN.

85. Plaintiff YOU, Plaintiff KIM and all other Plaintiffs have been suffering a severe physical and mental distress due to the denial of atrocities

and false accusation by many Defendants including Defendant ABE and Defendant SANKEI accusing the Plaintiffs of "prostitutes."

86. Defendants have denied any legal liability on the issue of atrocities committed to Plaintiffs. Defendant JAPAN officially never admitted the responsibility on the claim raised by Plaintiffs.

87. Further, Defendants including Defendant JAPAN have purposefully and intentionally concealed or manipulated the evidences showing direct control and involvement of Japanese government .

## CRIMES AGAINST HUMANITY

88. After the War, the United States Army prosecuted Nazi leaders as well as Japanese war criminals regarding war crimes in accordance with established principles of international law. Because of the atrocities that had occurred in the concentration camps, a new category, 'crimes against humanity,' was added to international law. [9]

89. General Telford Taylor, author of the final report of the Army on the Nuremberg War Crimes Trials, defined crimes against humanity as: "those acts which are part of a campaign of discrimination and persecution, and which are crimes against international law even when committed by nationals of one country against their fellow nationals or against those of other nations irrespective of belligerent status." [10]

90. The international prohibition of "crimes against humanity" is explicitly codified in several multilateral agreements and has been extensively litigated in international tribunals, constituting a body of doctrinal exposition.

[9] *United States v. Schiffer*, 831 F.Supp. 1166, 1180 (E.D.Pa.1993).
[10] See Raphael Lemkin, *Genocide as a Crime Under International Law*, 41 AM.J.INT'L L. 145 (1947), reprinted in NICHOLAS N. KTTRIE, INTERNATIONAL CRIMES AND PUNISHMENT (1999).

22

91. The "crimes against humanity" include any of the following acts committed as part of a widespread or systematic attack directed against any civilian population: murder; **enslavement**; deportation or forcible transfer of population; imprisonment; **torture**; **rape**, **sexual slavery**, **enforced prostitution**, forced pregnancy, enforced sterilization, or **any other form of sexual violence of comparable gravity**. (Emphasis added). Within the definition of crime that fall under the definition of crimes against humanity, sexual crimes against women should lie recognized as crimes against humanity. Sexual crimes should not include only rape in the conventional sense; but should also include sexual slavery, debasing, enforced pregnancy, enforced sterilization, and forcible insertion of any object into the vagina.

92. In 2008, the U.N. Security Council adopted resolution 1820, which noted that "rape and other forms of sexual violence can constitute war crimes, crimes against humanity or a constitutive act with respect to genocide".[11]

93. A crime against humanity claim is divided into two parts: (1) a set of required general elements, referred to as the chapeau; and (2) a list of acts, such as murder, extermination, enslavement, rape, and torture. Any of the acts committed in the context of the chapeau elements are crimes against humanity. The chapeau, though enumerated slightly differently in different instruments, generally consists of two elements: (1) a widespread or systematic attack; (2) directed against any civilian population. There also must be a nexus between the acts of the defendant and the chapeau.[12]

---

[11] "SECURITY COUNCIL DEMANDS IMMEDIATE AND COMPLETE HALT TO ACTS OF SEXUAL VIOLENCE AGAINST CIVILIANS IN CONFLICT ZONES, UNANIMOUSLY ADOPTING RESOLUTION 1820 (2008)". Un.org. Retrieved 2013-02-01.

[12] See *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir.2005);

94. Several federal courts in the United States have accepted the well-established nature of crimes against humanity and their actionability under the ATCA.[13]

95. In the present case, the Wartime Defendants willfully and knowingly performed, directed, assisted or conspired to kidnap young women in the occupied territories with specific criteria to select sex slaves in

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir.2005). Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955) ("The International Tribunal for Rwanda shall have the power to prosecute persons responsible for [crimes including murder, enslavement, deportation, imprisonment, torture, and rape] when committed as part of a widespread or systematic attack against any civilian population").

[13] See, e.g., *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 151 (2d Cir.2003) ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Aldana v. Fresh Del Monte Produce, Inc.,* 305 F.Supp.2d 1285, 1299 (S.D.Fla.2003) ("Crimes against humanity have been recognized as violation of customary international law since the Nuremberg Trials in 1944."); *Sarei v. Rio Tinto PLC,* 221 F.Supp.2d 1116, 1150 (C.D.Cal.2002) ("It is well-established that a party who commits a crime against humanity violates international law and may be held liable under the ATCA."); *Cabello,* 157 F.Supp.2d at 1360–61 ("[T]he ruling of the Nuremberg Tribunal memorialized the recognition of 'crimes against humanity' as customary international law."); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 440 (D.N.J.1999) (recognizing crimes against humanity as a violation of international law); *Quinn v. Robinson*, 783 F.2d 776, 799 (9th Cir.1986) ( "crimes against humanity, such as genocide, violate international law"). See also *United States v. Yousef,* 327 F.3d 56, 105 (2d Cir.2003) ("Following  the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction"); *Sosa,* 124 S.Ct. at 2783 (Breyer, J., concurring) (recognizing that international law views crimes against humanity as universally condemned behavior that is subject to prosecution).

terms of age, gender and race.[14] Because of such Plaintiffs' conduct, the physical and emotional health of the Plaintiffs was significantly destroyed forever. Therefore, the Defendants not only caused serious bodily or mental harm to the Plaintiffs as members of the specific group and deliberately inflicted on the group conditions of life calculated to bring about its physical destruction in whole or in part.

96. Further, it must be noted only young Korean women such as Plaintiff YOU and Plaintiff KIM, often still as legal minors, were systemically and continuously kidnapped or arrested by Japanese officials. Plaintiffs are not aware of any such kidnapping of Japanese women by force for the purpose of enslaving them at that time.

97. This whole process of selecting, kidnapping and transporting young Korean women including numerous numbers of legal minors for the purpose of sex slavery for the benefit of Japanese soldiers clearly constitute **RACIAL PERSECUTION** strongly condemned as genocide under both domestic and international laws.

98. Wartime Defendants committed the crime of genocide by (1) causing serious bodily or mental harm to members of the group, and (2) forcibly transferring children of the group to another group.

## **CRUEL, INHUMAN, OR DEGRADING TREATMENT**

99. The "cruel, inhuman, or degrading treatment" has been condemned by numerous sources of international law. The courts have thus held there is a clear international prohibition against cruel, inhuman or degrading

---

[14]Japanese government issued "imperial Ordinance No. 519" which forced the military to erect "comfort station" wherever Japanese troops were stationed. Chunghee Sarah Soh, *The Korean "Comfort Women" Movement for Redress,* 36 ASIAN SURVEY 1226, 1227-28(1976).

treatment.[15]

100. Especially, the United Nations Committee Against Torture's Initial Report specifically lists sexual abuse as a cruel act.[16]

101. In the present case, Plaintiffs were forced to serve as sex slaves in the "comfort stations" by the Wartime Defendants. These types of consistent and systemic acts of Wartime Defendants constitute sexual assault and sexual abuse condemned by the relevant laws against cruel, inhuman, or degrading treatment.

## COMMAND RESPONSIBILITY

102. Defendant HIROHITO and Defendant KISHI are responsible for the atrocities described herein under the legal theories including "command responsibility."

103. The Ninth Circuit noted that the legislative history of the Torture Victim Protection Act of 1991(TVPA) endorsed the concept of "command responsibility," long recognized in the law of war, and beginning to gain acceptance in the context of liability for peacetime acts of torture.

104. The principle of command responsibility that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law in connection with acts committed in wartime, as

---

[15] See *Tachiona v. Mugabe*, 216 F.Supp.2d 262, 281 (S.D.N.Y.2002); *Mehinovic*, 198 F.Supp.2d at 1348; Estate of Cabello, 157 F.Supp.2d at 1360–61; Jama v. U.S. I.N.S., 22 F.Supp.2d 353, 363 (D.N.J.1998); *Xuncax v. Gramajo,* 886 F.Supp. 162, 187 (D.Mass.1995); *Forti,* 694 F.Supp.at 711.

[16] See IL Aff. # 1, Para. 29. See Jama, 22 F.Supp.2d at 358–59 (sexual favors sought of female plaintiffs, including some being forced to submit to sexual assault as a precondition for contacting their lawyers by tele phone, and male and female detainees subject to inappropriate touching).

the Supreme Court's opinion.[17]

105. The Supreme Court held that the military governor of the Philippines and commander of the Japanese forces had an affirmative duty to take such measures within his power to protect prisoners of war and the civilian population.[18] The Ninth Circuit cited the Protocol to the Geneva Conventions of August 12, 1949 (hereinafter referred to as the "Geneva Convention Protocol") and the Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia (hereinafter referred to as the "Former Yugoslavia Statute") as additional evidence of international law principles.[19]

106. The Ninth Circuit cited the Former Yugoslavia Statute as stating that the fact that a human rights violation was committed "by a subordinate does not relieve ... [the] superior of criminal responsibility if he knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof."[20]

---

[17] *In re Yamashita*, 327 U.S. 1, 14–16, 66 S.Ct. 340, 90 L.Ed. 499 (1946).
[18] *In re Yamashita*, 327 U.S. 1, 14–16, 66 S.Ct. 340, 90 L.Ed. 499 (1946).

[19] *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 778, n. 5 (9th Cir.1996). In Article 86(2), the Geneva Convention Protocol states that "the fact that a breach of the Conventions or of this Protocol was committed by a subordinate does not absolve his superiors from penal [or] disciplinary responsibility ... if they knew, or had information which should have enabled them to conclude in the circumstances at the time, that he was committing or was going to commit such a breach, and if they did not take all feasible measures within their power to prevent or repress the breach." Hilao III, 103 F.3d at 777 (citing the Geneva Convention Protocol, 16 I.L.M. 1391, 1429 (1977)).

[20] *Hilao III,* 103 F.3d at 777 (citing the Former Yugoslavia Statute, art. 7(3), 32 I.L.M. 1159, 1192-

107. Similarly, in a suit against the Director of the Salvadoran National Guard and El Salvador's Minister of Defense brought by survivors of churchwomen tortured and murdered by the Salvador National Guardsmen, the Eleventh Circuit endorsed the command responsibility doctrine.[21] The court held that the essential elements of such responsibility are: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." [22]

108. While these cases and statutes have involved war or war-like contexts, the Ninth Circuit noted that the "United States has moved toward recognizing similar 'command responsibility' for torture that occurs even in peacetime, perhaps because the goal of international law regarding the treatment of non-combatants in wartime—to protect civilian populations and

---

94 (1993)). The Ninth Circuit also cited with approval Paul v. Avril, which held the former military ruler of Haiti responsible for arbitrary detention and torture committed by those "acting under his instructions, authority, and control and acting within the scope of authority granted by him." 901 F.Supp.330, 335 (S.D.Fla.1994).

[21] Ford v. Garcia, 289 F.3d 1283, 1288–89 (11th Cir.2002).

[22] 289 F.3d at 1288. See also Statute of the International Tribunal for Rwanda, U.N. SCOR, 49th Sess., art. 6(3), U.N. Doc. S/Res/955 (1994) (superior criminally responsible "if he or she knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof.").

prisoners ... from brutality, is similar to the goal of international human-rights law." [23]

109. Similarly, the statutes of the International Criminal Tribunal for Former Yugoslavia and Rwanda applied the doctrine of commander responsibility to civilian superiors as well as military commanders. In interpreting the Statute of the International Tribunal for Rwanda, the International Court after noting that the principle of command responsibility is "firmly established in international law" and constitutes a "principle of customary international law," held that the doctrine of superior responsibility embodied in the authorizing statute extends beyond military commanders to "encompass political leaders and other civilian superiors in positions of authority.[24]

110. The International Court reached the same conclusion in interpreting the statute applicable to human rights violations in the former Yugoslavia. [25]

111. In Tachiona v. Mugabe, the court found members of Zimbabwe's ruling party liable under the TVPA for "organiz[ing] targeted violence against political opponents and their families and supporters, assassinations and assassination attempts, kidnappings, tortures, rapes, beatings, mass

---

[23] *Hilao III*, 103 F.3d at 777 (quoting In re Yamashita, 327 U.S. at 15, 66 S.Ct. 340).

[24] *Prosecutor v. Kayishema & Ruzindana,"* No. 95–1, 1999 WL 33268309 ¶¶ 209, 213–16 (U.N. I.C.T (Trial)(Rwanda)) (citation omitted) available at http:// www.ictr.org. "The crucial question [is] not the civilian status of the accused, but of the degree of authority he exercised over his subordinates." Id. ¶ 216.

[25] Delalic, 1998 WL 2013972, ¶ 363 (principle of superior responsibility "extends not only to military commanders but also to individuals in non- military positions of superior authority").

destruction of property, and mob riots in a consistent and focused campaign of terror designed to crush political opposition to ZANU–PF."[26]  Other cases have found defendants liable for authorizing or directing torture or killings.[27]

112. In 1996, the Ninth circuit held that "'[A] higher official need not have personally performed or ordered the abuses in order to be held liable..[28]

113. During the War, **Defendant HIROHITO was Japan's king who was vital to the history because he ruled Japan as a military leader as well as monarch and played a major role in militarization and aggression of Japan during the time.** He pretended and was worshiped by his own people as "living god" throughout the War period. He led his country and other countries into armed aggression by initiating war with China and the U.S. as a supreme military leader. He was fully capable of waging and finishing war with foreign countries and that's what he actually did. He was in full commend of the nation, and every officers and soldiers of Japanese military forces were strictly following his order. Thus, **Defendant HIROHITO is liable for all the atrocities committed by Japanese government and military forces based on command responsibility, vicarious liability, contributory liability and inducement liability.**

114. Throughout the War, Defendant KISHI was a one of the important

---

[26] 216 F.Supp.2d 262, 270 (S.D.N.Y.2002)

[27] See, e.g., *Kadic,* 70 F.3d at 232.

[28] *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 778, n. 5 (9th Cir.1996). [R]esponsibility for torture, summary execution, or disappearances extends beyond the person who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them' ")). In the case, as Mr. Ferdinand Marcos, the late President of Philippines was a "higher official," the court concluded that he could be held liable for knowing about acts of torture and execution, and failing to take steps to prevent them.

officials of Japanese government holding numerous official seats including Minister of Munitions. Like Albert Speer of Nazi regime, Defendant KISHI was in full charge of supply of war materials to the military forces of Japan. Speer was indicted on all four possible counts: first, participating in a common plan or conspiracy for the accomplishment of crime against peace, second, planning, initiating and waging wars of aggression and other crimes against peace, third, war crimes, and lastly, crimes against humanity. Likewise, **Defendant KISHI is liable for all the war crimes** as he was found a "Class A" war crimes suspect by the order of the Supreme Commander of the Allied Powers. But for some uncertain reasons, he was not indicted or legally punished though he remained legally prohibited from entering public affairs for a while.

## AIDING AND ABETTING

115. A person is legally responsible for aiding and abetting a principal's wrongful act when the aider and abettor (1) carries out acts that have a substantial effect on the perpetration of a specific crime, and (2) acts with the specific intent (i.e., for the purpose) of substantially assisting the commission of that crime.[29]

116. The doctrine of aiding and abetting applicable under the Alien Tort Claims Act (ATCA), and presumably under the Torture Victims Protection Act (TVPA) which was intended to supplement and enhance remedies under the ATCA, reinforces this conclusion. [30]

---

[29] See *P Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, at 259 (2d Cir.2009).

[30] *Mehinovic,* 198 F.Supp.2d at 1355 ("United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law."); see also S.Rep.No.249–102, at 8–9 and n. 16.

117. In a case of Apartheid, the plaintiffs alleged that the automakers "provided information about anti-apartheid activists to the South African Security Forces, facilitated arrests, provided information to be used by interrogators, and even participated in interrogations." [31]

118. Restatement (Second) of Torts section 877(a) provides as follows for liability for inducing another person to commit a tort: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own, ...." [22] Section 877(a) overlaps with section 876(b), because in many cases, a defendant may both order or induce another to commit a tort and also give substantial assistance or encouragement to the tortfeasor.

119. Also, an additional basis for liability involves a defendant's permitting a tortfeasor to use the defendant's property to commit torts. Restatement (Second) of Torts section 877(c) provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (c) permits the other to act upon his premises or with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously.[32]

120. When a defendant helped direct tortfeasor in many ways such as conducts of disposing of stolen property and serving as the tortfeasor's banker, bookkeeper, and secretary over a five year period, the defendant was found to be liable.[33]

121. Under the principle of secondary liability, advice or encourageme

---

[31] *In re South African Apartheid Litig*., 617 F.Supp.2d 228, 257 (S.D.N.Y.2009).

[22] RESTATEMENT (SECOND) OF TORTS § 877(a) (1979).

[32] RESTATEMENT (SECOND) OF TORTS § 877(c) (1979).

[33] *Halberstam v. Welch*,.705 F.2d 472 (D.C. Cir. 1983).

nt to act operates as a moral support to a tortfeasor constitutes wrongful conduct if the act encouraged is known to be tortious as it has the same effect upon the liability of the adviser as participation or physical assistance. [34]

122. It is well established that the claim of aiding and abetting crimes against humanity is a recognized offense in international law under treaty and several international tribunals. [35]

123. In the present case, the Corporation Defendants affirmatively evidenced their support for the Japanese government's conduct, either implicitly by intentionally creating custom equipment or explicitly realizing significant amounts of financial gains.

124. Also, Defendant JAPAN, Defendant ABE, Defendant SANKEI as well as Defendants DOES 1-1000 actively supported or justified the crimes against humanity committed against Plaintiffs resulting increasing ethnic hatred and violence against Korean people including Plaintiffs in Japan on a daily basis.

125. Plaintiffs allege that the Corporation Defendants (a) knowingly and substantially assisted a principal tortfeasor to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the principal tortfeasors with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools,

---

[34] See *Aetna Cas. and Sur. Co. v. Leahey Constr. Co.,* 219 F.3d 519, 535 (6th Cir. 2000) ("For the purposes of establishing aiding and abetting liability, '[t]he requisite intent and knowledge may be shown by circumstantial evidence.' ").

[35] *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 453 F. Supp. 2d 633, 162 O.G.R. 1109 (S.D. N.Y. 2006), judgment entered, 2006 WL 3469542 (S.D. N.Y. 2006) and judgment aff'd, 582 F.3d 244 (2d Cir. 2009).

instrumentalities, or services would be (or only could be) used in connection with that purpose. Such allegations, if proven, clearly satisfy the standard for asserting ATCA liability under an aiding and abetting theory.

## **DEFAMATION**

126. A statement is "reasonably susceptible" of a defamatory meaning when it " 'tend[s] to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community.' "[36]

127. Plaintiffs are not public figures. Plaintiffs did not inject themselves into an issue of public interest, concern, or controversy so as to become limited purpose public figures.

128. In the area of defamation, the law is primarily concerned with the defamatory statement's effect on the plaintiff's reputation, on how others view the plaintiff, rather than the mental and emotional well-being of the plaintiff.[37] Therefore, there must be a "publication" of the defamatory statement by the defendant.

129. It is well established that the charge that a woman lacks chastity includes such accusations as the woman is a **"whore"** or a **"slut"** definitely constitute defamation.**[38]**

---

[36] *Levin,* 119 F.3d at 195 (quoting Tracy v. Newsday, Inc., 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853, 854 (1959)); see also Fairley v. Peekskill Star Corp., 83 A.D.2d 294, 296, 445 N.Y.S.2d 156, 158 (2d Dep't 1981).

[37] Smolla, *Law of Defamation 2d* § 1:22; Heinke, Media Law § 2.5(F) (1994). But see *O'Hara v. Storer Communications, Inc.,* 231 Cal. App. 3d 1101, 282 Cal. Rptr. 712, 19 Media L. Rep. (BNA) 1225 (4th Dist. 1991), reh'g denied and opinion modified, (July 24, 1991) (diminution of business income due to psychic injury resulting from the broadcast of a false allegation that plaintiff was a prostitute is recoverable in defamation).

[38] *Tanya G. v. Adrianas Ins. Services, Inc.,* 2005 WL 2100276 (Cal. App. 2d Dist. 2005), unpublished/noncitable (Mosk, J., concurring), citing *Pink v.*

130. Defendant ABE and Defendant SANKEI have frequently defamed Plaintiffs calling Plaintiffs as "voluntary prostitutes" also by denying the governmental involvement in the sex slave system during the War. For example, in 2012, Defendant ABE signed an advertisement in a New Jersey newspaper which argued that Plaintiffs were simply part of the licensed prostitution system of the day.[39]

131. Further, Defendant ABE even went as far as to say that the Plaintiffs voluntarily worked as prostitutes and were better paid than the soldiers.[40]

132. Defendant SANKEI has published numerous articles where it repeatedly insisted that the fact on coercive kidnapping of victims was false and the victims were prostitutes. [41] Also, Defendant SANKEI also publicly

---

*Catanich*, 51 Cal. 420, 1876 WL 1662 (1876) ("whore"); *Contento v. Mitchell*, 28 Cal. App. 3d 356, 357, 104 Cal. Rptr. 591 (1st Dist. 1972) ("whore"); *Walia v. Vivek Purmasir& Associates, Inc.,* 160 F. Supp. 2d 380, 394 (E.D. N.Y. 2000) ("whore" and "slut," applying New York law); *Smith v. Atkins*, 622 So. 2d 795, 799, 85 Ed. Law Rep. 370 (La. Ct. App. 4th Cir. 1993) ("slut" is defamatory per se under Louisiana law); *Bryson v. News America Publications, Inc.,* 174 Ill. 2d 77, 102, 220 Ill. Dec. 195, 672 N.E.2d 1207, 25 Media L. Rep. (BNA) 1321 (1996) ("slut").

[39] *The Comfort Women and Japan's War on Truth*, N.Y. Times (Nov. 15, 2014).http://www.nytimes.com/2014/11/15/opinion/comfort-women-and-japans-war-on-truth.html?_r=0(last visited April 30, 2015).

[40] . Steve Kuan, *Alien Tort Claims Act--Classifying Peacetime Rape as an International Human Rights Violation*, 22 Hous. J. Int'l L. 451, 455 (2000).

[41] See Editorial, *Coercive Recruitment Is False,* Sankei (April 20, 2015) . http://www.sankei.com/west/news/150420/wst1504200006-n1.html (last visited April 30, 2015) and Editorial *There Was A Rebuttal Raised To Japan's Japan "Unscrupulous Degree Of" Stigma To "Sex Slaves,"* Sankei, (November, 11, 2014).

asserted that the argument of "forced sex slavery" against Plaintiffs was false and misleading.[42]

133. **The statute of limitation has not expired yet under the continuing tort doctrine** as the cause of action is not complete and does not accrue until the tortious acts have ceased." [43]

134. Those defaming statements by the Defendant ABE and Defendant SANKEI have been easily and widely accessed, distributed, and viewed in the territory of U.S. including State of California.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

135. To succeed on an intentional infliction of emotional distress claim, a plaintiff must allege, and then prove by clear and convincing evidence that: (1) the wrongdoer's conduct is intentional or reckless; (2) the conduct is outrageous and intolerable; (3) the alleged wrongful conduct and emotional distress are causally connected; and (4) the distress is severe.

136.To plead intentional infliction of emotional distress, Plaintiffs show (1) that defendants engaged in extreme and outrageous conduct, (2) with intent to cause or in disregard of a substantial probability that the

---

[42] . Editorial It Is Proper To Revise False Description In Textbooks, Sankei (Jan. 18, 2015).
http://www.sankei.com/life/news/150118/lif1501180020-n1.html html (last visited April 30, 2015).
[43] Gen. *Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir.2007) .In *Watts v. Chittenden*, Case No. SC 18474 (CT S.Ct., Jul. 19, 2011), the court held that the continuing course of conduct exception to the statute of limitations applies to intentional infliction of emotional distress claims. See Gross v. United States, 676 F.2d 295, 300 (8th Cir.1982) (where tortious conduct is continuing in nature, statute of limitations for FTCA claim runs from date of last tortious act). In the present case, Defendants have not only denied the tortious acts of their own but been repeatedly inflicting emotional distress by accusing Plaintiffs as "paid prostitutes" openly through mass-media and other means of communication.

conduct would cause severe emotional distress, (3) a causal connection between their acts and her injury, and (4) severe emotional distress. [44]

137. Negligent infliction of emotional distress must be based on defendants' breach (1) of a duty owed to plaintiff (2) that unreasonably endangered her or caused her to fear for her own safety.[45]  Extreme and outrageous conduct is also an element of negligent infliction of emotional distress.[46]

138. The intent element of an intentional infliction of emotional distress cause of action is satisfied when the defendant had the specific purpose of inflicting emotional distress or when the specific conduct was intended and the actor knew or should have known that emotional distress would likely result.

139. In the present case, the Wartime Defendants are liable for said conduct in that Defendants, acting under color of law and authority as Japanese officials, set the conditions for, committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated the war-time sex slavery on Plaintiffs, without Plaintiffs' consent, causing Plaintiffs to be subjected to perform sexual labor to Japanese soldiers against their will and forced the Plaintiffs to continue the slave-like performance by way of threat of beating, starvation, and summary execution,

---

[44] *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121 (1993); *Suarez v. Bakalchuk,* 66 AD3d 419 (1st Dep't 2009).

[45] *Bernstein v. East* 51st St. Dev. Co., LLC, 78 AD3d 590, 591 (1st Dep't 2010); *Sheila C. v. Povich,* 11 AD3d 120, 130 (1st Dep't 2004).

[46] *Bernstein v. East 51st St. Dev. Co.,* LLC, 78 AD3d at 592; Lau v. S & M Enters., 72 AD3d 497, 498 (1st Dep't 2010); *Goldstein v. Massachusetts Mut. Life Ins. Co.,* 60 AD3d 506, 508 (1st Dep't 2009); *Berrios v. Our Lady of Mercy Med.* Ctr., 20 AD3d 361, 362 (1st Dep't 2005).

throughout the time of the slavery. Defendants intended, knew or should have known, that the war-time sex slavery was being committed by their subordinates and failed to prevent such abuse or punish those responsible.

140. As a prime minister and a prominent newspaper, Defendant ABE and Defendant SANKEI have inflicted a serious emotional distress by expressing and distributing this false allegation that the victims were "voluntary prostitutes."

141. In many occasions, Defendant ABE signaled his intent to retract that apology as part of an effort to rewrite Japan's wartime history, stating that his previous administration had found no evidence that the women who served as sex slaves to Japan's wartime military had, in fact, been coerced. [47]

142. Defendant ABE even went as far as to say that Plaintiffs voluntarily worked as prostitutes and were better paid than the soldiers.[48]

143. Among other occasions, in 2012, Defendant ABE signed an advertisement in a New Jersey newspaper which argued that Plaintiffs were simply part of the licensed prostitution system of the day.[49]

144. Further, Defendant ABE even went as far as to say that the Plaintiffs voluntarily worked as prostitutes and were better paid than the soldiers. [50]

---

[47] See Editorial, *Another Attempt to Deny Japan's History*, N.Y. Times (Jan. 2, 2013).

[48] . Steve Kuan, *Alien Tort Claims Act--Classifying Peacetime Rape as an International Human Rights Violation,* 22 Hous. J. Int'l L. 451, 455 (2000).

[49] *The Comfort Women and Japan's War on Truth,* N.Y. Times (Nov. 15, 2014).http://www.nytimes.com/2014/11/15/opinion/comfort-women-and-japans-war-on-truth.html?_r=0(last visited April 30, 2015).

[50] Steve Kuan, *Alien Tort Claims Act--Classifying Peacetime Rape as an International Human Rights Violation,* 22 Hous. J. Int'l L. 451, 455 (2000).

145. Defendant SANKEI has published numerous articles where it insisted that the fact on coercive kidnapping of victims is false and the victims are prostitutes. [51]

146. Defendant SANKEI also publicly asserted that the argument of "forced sex slavery" against Plaintiffs was false and misleading.[52]

147. Those defaming statements by the Defendants ABE and SANKEI have been easily and widely accessed, distributed, and viewed in the territory of the U.S. including State of California.

148. The Defendant ABE and Defendant SANKEI repeatedly have made, publicized, expressed those outrageously false statements with intent to cause or in disregard of a substantial probability that their conduct would cause severe emotional distress to Plaintiffs.

149. It has been well established that the conduct to call victims of sex crime a "prostitute" constitutes defamation and intentional infliction of emotional distress.[53]

150. The statute of limitation should be tolled against Wartime Defendants because when a defendant intentionally misinformed or concealed information from the plaintiff, the equitable tolling is applied.[54]

---

[51] See Editorial, *Coercive Recruitment Is False,* Sankei (April 20, 2015) .http://www.sankei.com/west/news/150420/wst1504200006-n1.html (last visited April 30, 2015).and Editorial *There Was A Rebuttal Raised To Japan's Japan "Unscrupulous Degree Of" Stigma To "Sex Slaves,"* Sankei, (November, 11, 2014).
http://www.sankei.com/column/news/141111/clm1411110010-n2.html (last visited April 30, 2015).

[52] Editorial *It Is Proper To Revise False Description In Textbooks,* Sankei (Jan. 18, 2015). http://www.sankei.com/life/news/150118/lif1501180020-n1.html (last visited April 30, 2015).

[53] See *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419, Neb.,(2006).

39

# RACKETEERING INFLUENCED & INFLUENCED & CORRUPT ORAGANIZATION ACT

151. The one of the primary causes of this action is a widespread criminal enterprise engaged in a pattern of racketeering activity across State lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the War.

152. Under Racketeer Influenced & Corrupt Organizations Act (RICO),1)"racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code:

section1351 (relating to fraud in foreign labor contracting),

sections 1461–1465 (relating to obscene matter),

sections 1581–1592 (relating to peonage, slavery, and trafficking in persons).,

sections2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children)

153. "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to

---

[54] *Webb v. Perkiomen School*, 349 Fed. Appx. 675, 253 Ed. Law Rep. 159 (3d Cir. 2009).

acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. 18 U.S. Code § 1962

154. The Supreme Court held that on its face the term 'enterprise' includes both legitimate and illegitimate enterprises. [55] The Court also held that "there is no requirement that a private action under § 1964(c) can proceed only against a defendant who has already been convicted of a predicate act or of a RICO violation.[56]

155. Here, Plaintiffs bring claims for RICO violation and conspiracy to violate RICO. To succeed on a claim under RICO, a plaintiff must prove each of the following four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[57]

156. RICO defines racketeering activity as any act indictable under 18 U.S.C. §§ 1341 and 1343. A pattern of racketeering activity requires at least two acts of racketeering activity. [58]

---

[55] *U.S. v. Turkette*, 452 U.S. 576, 580 (1981).
[56] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985).
[57] *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir.1988).
[58] 18 U.S.C. § 1961(5).

157. The Plaintiffs set forth five causes of action. First, the Plaintiffs allege that the defendants' actions amounted to violations of the RICO Act. Specifically, Plaintiffs allege that both Plaintiff YOU and Plaintiff KIM and each member of the purported class are "persons" as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c). The Plaintiffs allege that, for purposes of this claim, the RICO "Enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of defendants, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries, (the "Enterprise").

158.The "Enterprise" was separate and distinct from the persons that constituted the Enterprise and was primarily managed by Defendants, which organized the fraudulent scheme and mobilized Plaintiffs by force. Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent direction.

159. "Enterprise" is defined as including "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." § 2923.31(C). The Supreme Court of Ohio has remarked that "[t]he definition of 'enterprise' is remarkably open-ended" and observed that the statute "does not indicate how the existence of an enterprise is to be proved." Several recent cases have sought to clarify the definition of an enterprise and develop standards to prove its existence.

160. In this case, Plaintiffs believe and assert that so –called Japanese Empire which existed during the War was an "Enterprise" under the RICO

laws led by Defendant HIROHOTO and other key persons including Defendant KISHI.

161. The Defendants need only "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive" violation of § 1962(c). These elements are:

> (1) the existence of an enterprise affecting interstate commerce;
>
> (2) that the defendant was employed by or associated with the enterprise;
>
> (3) that the defendant participated in, either directly or indirectly, in the conduct or the affairs of the enterprise; and
>
> (4) that he or she participated through a pattern of racketeering activity. [59]

162. To prove that a defendant was "associated" with an Enterprise, the prosecution or a civil plaintiff must prove that each defendant was voluntarily connected to that pattern [of corrupt activity] and performed at least two acts in furtherance of it.

163. **The Defendants "participated" in the affairs of the Enterprise.** Here, "participate" means "to take part in and is not limited to those who have directed the pattern of corrupt activity. It encompasses those who have performed activities necessary or helpful to the operation of the enterprise whether directly or indirectly without an element of control."

164. The Supreme Court of Ohio indicated that "the concepts of 'common purpose' and 'acting in concert' are included in the concepts of

---

[59] *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir.2003) (quoting *United States v. Console,* 13 F.3d 641, 652–53 (3d Cir.1993)).

'associating with an enterprise' and 'conducting or participating in the affairs of that enterprise.' "[60].

165. The Supreme Court of Ohio formally adopted the federal RICO definition of an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct.[61]

166. In the present case, Defendants' activity includes (A) act or threat involving murder, kidnapping,  dealing in obscene matter, which is chargeable under State laws and punishable by imprisonment for more than one year; (B) act which is indictable under any of the following provisions of title 18, United States Code: sections 1461–1465 (relating to obscene matter),sections 1581–1592 (relating to peonage, slavery, and trafficking in persons), and sections2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children),

167. In the present case, there was an Enterprise called "Japanese Empire." The Individual Defendants were either led or employed / associated by the Enterprise. They participated in, either directly or indirectly, in the conduct or the affairs of the Enterprise through a pattern of racketeering activity during the War period

168. **During the War, the Enterprise by the Wartime Defendants was engaged in, and its activities affected, the interstate commerce of the U.S. by disrupting the commercial activities of U.S. citizens.** The proceeds of the Enterprise were distributed to its participants, including Corporation Defendants.

---

[60] *State v. Griffin*, 24 N.E.3d 1147 (Ohio 2014),

[61] " *Beverly, 2015–Ohio–219,* at ¶ 9 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

44

169. Plaintiffs allege that the Wartime Defendants meet the requirements to prove pattern of racketeering activity as a RICO action could incorporate acts before October 15, 1970, if the defendant also engaged in prohibited activities after that date. In the present case, Wartime Defendants have been engaging in such conducts as fraud, obstruction of justice, dealing in obscene matter, and slavery even today by concealing their unlawful conducts and defaming Plaintiffs as "voluntary prostitutes."

170. Also, even today, there is an enterprise with active presence in the U.S. consisting Defendant ABE and Defendant SANKEI systemically and continually waging a campaign making spreading false and incorrect assertions against those sex slavery claiming that the victims of these cruel and inhumane crime were only "voluntary prostitutes."
Among other occasions, in 2012, Defendant ABE signed an advertisement in a New Jersey newspaper which argued that Plaintiffs were simply part of the licensed prostitution system of the day.[62]

171. Further, Defendant ABE even went as far as to say that the Plaintiffs voluntarily worked as prostitutes and were better paid than the soldiers. [63]

172. Defendant SANKEI has published numerous articles where it insisted that the fact on coercive kidnapping of victims is false and the victims are prostitutes. [64]

---

[62] *The Comfort Women and Japan's War on Truth,* N.Y. Times (Nov. 15, 2014).http://www.nytimes.com/2014/11/15/opinion/comfort-women-and-japans-war-on-truth.html?_r=0(last visited April 30, 2015).
[63] Steve Kuan, *Alien Tort Claims Act--Classifying Peacetime Rape as an International Human Rights Violation,* 22 Hous. J. Int'l L. 451, 455 (2000).
[64] See Editorial, *Coercive Recruitment Is False,* Sankei (April 20, 2015) .http://www.sankei.com/west/news/150420/wst1504200006-n1.html (last visited April 30, 2015).and Editorial *There Was A Rebuttal Raised To*

173. Defendant SANKEI also publicly asserted that the argument of "forced sex slavery" against Plaintiffs was false and misleading.[65]

174. Those defaming statements by the Defendants ABE and SANKEI have been easily and widely accessed, distributed, and viewed in the territory of the U.S. including State of California.

175. The Defendant ABE and Defendant SANKEI repeatedly have made, publicized, expressed those outrageously false statements with intent to cause or in disregard of a substantial probability that their conduct would cause severe emotional distress to Plaintiffs.

176. Defendant ABE and Defendant SANKEI's conducts are related as they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Their conducts are significantly related each other with the same or similar purposes to deny historical facts on sex slaves cases and with same or similar result to inflict significant amount of injuries to Plaintiffs.

177. The specific statements were themselves fraudulent, *i.e.,* themselves contained false or misleading information on the true nature of comfort women.

---

*Japan's Japan "Unscrupulous Degree Of" Stigma To "Sex Slaves,"* Sankei, (November, 11, 2014). http://www.sankei.com/column/news/141111/clm1411110010-n2.html (last visited April 30, 2015).
[65] Editorial *It Is Proper To Revise False Description In Textbooks,* Sankei (Jan. 18, 2015). http://www.sankei.com/life/news/150118/lif1501180020-n1.html (last visited April 30, 2015).

178. Alternatively, Plaintiff believes and alleges that the mails or wires were simply used in furtherance of a master plan to defraud Plaintiffs and other people around the world.

179. **Defendant ABE and Defendant  SANKEI are also liable under RICO violating state laws on kidnapping and dealing in obscene matter.**

180. The statute of limitations should not be applied for wartime Defendant or Defendant ABE and Defendant SANKEI because those conducts in violation of RICO is being continued.

181. Alternatively, Plaintiffs argue that the RICO statute does not include an express statute of limitations. Even if there is a statute of limitation, the "equitable tolling" principles generally applicable to federal statutes of limitations render its RICO claims.

182. In fact, dismissing a claim as barred by the statute of limitations "is appropriate only if it is apparent from the face of the complaint that the claim is time barred," and then "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute."[66]

183. The limitations period for a civil RICO action begins to run when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be a part of a pattern of racketeering." [67] The separate accrual rule "provides that if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over

---

[66] *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 and n. 13 (11th Cir.2005).

[67] *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir.2001) (citing Rotella, 528 U.S. at 1080) (rejecting both the injury and pattern discovery rule and the "last predicate act" rule).

for the damages caused by the new act."[68] The limitations period is only affected if the later act inflicts a "new and independent injury rather than merely an accumulating injury on the plaintiff."[69]  184. **It should be noted that a new and independent injury is being added on a daily basis** as those Defendants including Defendant ABE and Defendant SANKEI have been engaging in systemic and continuous tort inflicting significant damages to the Plaintiffs. Without judicial verdict from this court, this injury occurring today would last forever.

## STATUTE OF LIMITATIONS

185. The statute of limitations is tolled where the defendant undertakes an "affirmative and independent act of concealment that would prevent the plaintiff from discovering the injury despite the exercise of reasonable diligence."[70]

186. The limitations period may be tolled even absent reasonable diligence if the defendant has engaged in fraudulent concealment.[71]

187. It is held that two situations in which the "strict letter of general statutes of limitation" would not be followed. The first situation is "where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts," and the second is "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part."[72]

---

[68] *Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir.2013).
[69] *Pilkington v. United Airlines*, 112 F.3d 1532, 1537–38 (11th Cir.1997).

[70] Bohus v. Beloff, 950 F.2d 919, 926 (3d. Cir.1991).
[71] see Pac. Harbor Cap., Inc. v. Barnett Bank, N.A., 252 F.3d 1246, 1252 (11th Cir.2001).
[72] Bailey v. Glover, 21 Wall. 342, 349–350, 22 L.Ed. 636 (1875).

188. The fraudulent concealment of the facts giving rise to a claim tolled the controlling statute of limitations until full disclosure was made.

189. In the present case, Wartime Defendants hold and possess all the relevant evidence regarding the subject matter of this case because as a colony of so-called Japan, Korea was under strict and harsh rules of Japan.

190. However, Wartime Defendants consistently refused to provide any evidence under their control to Plaintiffs and refused to respond legal processes in Korean courts regarding "comfort women" lawsuits.

191. Moreover, Wartime Defendants have intentionally and consistently concealed, manipulated, and distorted the horrible nature of the comfort women cases denying any legal liabilities at all.

192. Therefore, Plaintiffs hereby believe and allege that the Wartime Defendants' wrongful conduct tolled the limitations period.

## CLASS ACTION ALLEGATIONS

193. Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)2, and 23(b) 3, Plaintiff brings this action for herself and on behalf of a class of persons consisting of all innocent former sex slaves who, through no fault of their own, suffered damage as a but-for and proximate cause of Defendants' international legal torts, specifically (1) their conspiracy to commit the crime against humanity and (2) the crime against humanity itself. Plaintiffs request certification pursuant to Federal Rule of Civil Procedure 23(b)(3) (hereinafter referred to as the "Sex Slaves' Class") The Iraq Civilian Victims' Class, as defined herein, includes all former sex slaves who were damaged by the Defendants.

194. Plaintiff and members of the Sex Slaves' Class may also seek to amend this complaint further in order to establish subclasses including, but not limited to, one or more of the following:

a. A subclass of Sex Slaves who were subject to unspeakable torture or other war crimes;

b. A subclass of Sex Slaves who were defrauded to leave home countries;

c. A subclass of Sex Slaves who were forced to leave home countries;

d. A subclass of Sex Slaves whose consent to the slavery was void due to their legal minor status.

e. A subclass of Sex Slaves who sustained property damage and/or property loss;

e. Any additional subclass or subclasses of Sex Slaves who have suffered injuries necessitating compensatory damages, to be determined at a later stage in these proceedings.

195. A class action is the superior method for adjudication of this controversy. In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions. Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against government defendants. Finally, given the lack of an adequate forum for these claims in Japan, it would be logistically and financially impossible for the thousands of class members to each bring an individual action in the courts of the United States.

196. Plaintiffs and their attorney will fairly and adequately assert and protect the interests of the Class.

197. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at the present time, it is estimated that there are thousands of members in the Class.

198. The claims or defenses of the represented parties are typical of

the claims or defenses of the Class. Plaintiffs have the same interests as the other Class members in prosecuting the claims against the Defendants. Plaintiffs and all the members of the Class sustained damages as a result of Defendants' wrongful conduct.

## RULE 23(A) PREREQUISITES

199. The prerequisites to a class action under Rule 23(a) of the Federal Rules of Civil Procedure exist:

a. Numerosity: The members of the Sex Slaves' Class are so numerous that joinder of all class members is impracticable. While the exact number of Sex Slaves is unknown to the Representative Plaintiff at this time, it is likely that hundreds of thousands or even millions of Sex Slaves may have been subject to damages as a result of Defendants' actions, and would have standing to pursue such claims under 28 U.S.C. § 1350.[73]

b. Commonality: Common questions of law and fact exist as to all members of the Sex Slaves' Class and predominate over questions affecting individual members of the Sex Slaves' Class Questions of law and fact common to the Sex Slaves' Class include, but are not limited to, the following:

> (1) Whether the actions of Defendants constituted a conspiracy to engage in a crime against humanity, and whether that conspiracy was the cause of damages to Sex Slaves;

---

[73]Historian Yoshiaki Yoshimi, who conducted the first academic study on the topic which brought the issue out into the open, estimated the number to be between 50,000 and 200,000. *"Sex slaves put Japan on trial",* BBC News, December 8, 2000, retrieved 2008-07-01.

(2) Whether the actions of Defendants constituted a crime against humanity, and whether that war of aggression was the cause of damages to Sex Slaves.

c. Typicality: The claims of the Representative Plaintiff istypical of the claims of all members of the Sex Slaves' Class because all members of the proposed class share the common characteristic of being civilian of occupied territories whose basic human rights were ignored and who were damaged as a result of Defendants' conspiracy and committing of crime against humanity, as complained herein.

d. Adequacy of Representation: The Representative Plaintiffs will fairly and adequately protect the interests of the Sex Slaves' Class and is represented by counsel competent and experienced in litigation. The Representative Plaintiff is a member of the Sex Slaves' Class with claims typical of the claims of all class members. The Representative Plaintiffs do not have interests that are antagonistic to or in conflict with those persons whom the Representative Plaintiffs seek to represent.

## CAUSES OF ACTION

200. As a result of the foregoing, Plaintiffs assert that Defendants violated U.S. laws, international treaties  as well as customary international law by conducting, facilitating, participating in, aiding and abetting in, cooperating with and/or conspiring with others (1) to commit crimes against humanity; (2) to commit torture, cruel, inhuman, or degrading treatment; (3) to commit the crime against humanity; (4) to commit aiding and abetting a wrongful act; (5) to commit defamation as well as intentional infliction of emotional distress ; and (6) to violate Racketeer Influenced & Corrupt Organizations Act.

## COUNT ONE

**(Crimes Against Humanity Against**

**All Wartime Defendants and Defendants, DOES 1-1000)**

201. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

202. Plaintiffs bring this claim against the Wartime Defendants and Defendants Does 1-1000.

203. The Wartime Defendants and Defendants Does 1-1000 participated in the activities of the so-called Japanese Empire in furtherance of the commission of war crimes, crimes against humanity, crimes against peace, torture, rape, starvation, physical and mental abuse, summary execution and genocide. Specifically, the actions and conduct of the Defendants, in addition to being profitable, actively assisted the war objectives of the Japanese Empire.

204. The acts by the Wartime Defendants as well as and Defendants Does 1-1000 described herein constitute war-time sex slavery against human subjects which occurred in places including high seas and the U.S. territories at that time such as Guam as well as Philippines in that wartime in violation of the law of nations and are, therefore, actionable under the Alien Tort Statute (ATS). The customary international law prohibition of war-time sex slavery on non-consenting human subjects is expressed and defined innumerous international treaties and declarations, international judicial decisions, and in the domestic legislation of numerous countries throughout the world, including the United States. It is widely-recognized that experimentation on unknowing human subjects is morally and legally unacceptable.

205. The Wartime Defendants and Defendants Does 1-1000 are liable for the alleged conduct in that the Defendants, acting under color of law and

authority as Japanese officials, set the conditions for, committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated the war-time sex slavery on Plaintiffs, against Plaintiffs' will. Those Wartime Defendants and Defendants Does 1-1000 intended, knew or should have known, that the non-consensual war-time sex slavery was being committed by their subordinates and failed to prevent such abuse or punish those responsible.

206. In 1993. Mr. Yohei Kono, then Chief cabinet Secretary of Japanese government officially admitted the positive role and responsibility of Japanese government regarding sex slave issues through "Kono Statement." In the Kono statement, Mr. Kono acknowledged that "the then Japanese military was, directly or indirectly, involved in the establishment and management of the comfort stations" and "The recruitment of the o-called comfort women was conducted mainly by private recruiters who acted in response to the request of the military." In addition, as the Kono statement articulates, "in many cases they were recruited against their own will, through coaxing, coercion, etc.", "at times, administrative/military personnel directly took part in the recruitments.", and "they lived in misery at comfort stations under a coercive atmosphere.[74]

207. The war-time sex slavery, which violates one's rights to life, health, and personal integrity, is universally condemned as violation of customary international law, as reflected in various international instruments, such as the Nuremburg Code, which states as its first principle that "[t]he

---

[74] Sterngold, James (5 August 1993*). "Japan Admits Army Forced Women Into War Brothels"*. The New York Times.p.2.Retrieved26 February 2014.

voluntary consent of the human subject is absolutely essential," the Universal Declaration of Human Rights ("UDHR"), and Article 7 of the International Covenant on Civil and Political Rights ("ICCPR").

208. Other international documents prohibiting non-consensual war-time sex slavery include the 2001 Directive passed by the European Parliament and the Council of the European Union. This prohibition is also recognized by the U.S. Government. The prohibition of war-time sex slavery is further demonstrated in the enactment by no less than eighty-four countries of laws explicitly including the prohibition. For its part, violations of this international prohibition are capable of impairing international peace and security, especially, as here, when the military forces of one country violates the rights of another State's citizens.

209. Plaintiffs are aware of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) in which the Supreme Court held that the application of ATS on human right violation committed in overseas is restricted, unless there is a strong connection to the United States.

210. Plaintiffs submit that *Kiobel* is distinguishable in this case in that (1) the Defendants' conduct substantially and adversely affects an important American national interest, and  (2)  this claim touches and concerns the territory of the United States with sufficient force to displace the presumption against extraterritorial application, and (3) active presence of Defendants including Defendant JAPAN, Corporation Defendants, and Defendant SANKEI in the U.S. is much more than "mere presence."

211. As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs have been subjected to severe physical and psychological injuries and have incurred expenses and suffered damages.

These injuries have caused and will continue to cause Plaintiffs great physical and mental pain and suffering.

212. Plaintiffs are informed and believe and thereon allege that the Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against the Defendants.

213. Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages.

## COUNT TWO

### (Violation of Prohibition Against Cruel, Inhuman, or Degrading Treatment: Alien Tort Statute 28 U.S.C. § 1350 Against All Wartime Defendants and Defendants, DOES 1-1000)

214. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

215. Plaintiffs bring this claim against all Wartime Defendants and Defendants, Does 1-1000. The Defendants' acts described herein constitute cruel, inhuman, or degrading treatment of Plaintiffs in violation of the laws of nations and are, therefore, actionable under the Alien Tort Statute.[75] The customary international law prohibiting cruel, inhuman, or degrading treatment is expressed and defined in international treaties and international and domestic judicial decisions, among other authorities.

216. The Defendants are liable for the alleged conduct occurred in numerous places including high seas and the U.S. territories at that time such as Guam as well as Philippines in that wartime. Defendants, acting under color of law and authority as Japanese officials, set the conditions for,

---

[75] 28 U.S.C. § 1350.

committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated the war-time sex slavery on Plaintiffs, without Plaintiffs' consent. The Defendants intended, knew or should have known, that the war-time sex slavery was being committed by their subordinates and failed to prevent such abuse or punish those responsible.

217. The use of "forced labor," which is defined by International Labour Organization Forced Labor Convention of 1930 as all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily, violates international law, as required for claim under Alien Tort Statute (ATS). [76]

218. Cruel, inhuman, degrading treatment is widely prohibited by a variety of international human rights instruments, including the UDHR (Art. 5), the ICCPR (Art. 7), as well as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") (Art. 16).[77]

219. Plaintiffs are aware of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) in which the Supreme Court held that the application of ATS on human right violation committed in overseas is restricted, unless there is a strong connection to the United States.

220. Plaintiffs submit that *Kiobel* is distinguishable in this case in that (1) the Defendants' conduct substantially and adversely affects an important American national interest, and  (2)  this claim touches and concerns the territory of the United States with sufficient force to displace the

---

[76] 28 U.S.C.A. § 1350.

[77] The United States is a party to the ICCPR, having signed on October 5, 1977 and ratified the Covenant on June 8, 1992, and to the CAT, having signed on April 18, 1988, and ratified on October 21, 1994.

presumption against extraterritorial application, and (3) active presence of Defendants including Defendant JAPAN, Corporation Defendants, and Defendant SANKEI in the U.S. is much more than "mere presence."

221. As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs have been subjected to severe physical and psychological pain and suffering and have incurred expenses and suffered damages. These injuries have caused and will continue to cause Plaintiffs great physical and mental pain and suffering.

222. Plaintiffs are informed and believe and thereon allege that the wartime Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against the Defendants.

223. Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages.

## COUNT THREE

## (Conspiracy To Commit the Crime Against Humanity Against All Wartime Defendants)

224. Plaintiffs incorporate herein preceding paragraphs 1-199 of this Complaint as if set forth fully herein.

225. Plaintiffs bring this claim against all Wartime Defendants. The crime of conspiracy to commit atrocities is also a violation of the relevant U.S. laws as well as customary international law, which creates binding obligations on the United States, its citizens, and its courts. The United States has not only recognized "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice" but it has established

that a court may look to customary international law when its own nation lacks any instruction that is on point for a particular matter. The crime of conspiracy to commit atrocities against civilians has been recognized by the United States, inter alia, in the Nuremberg Charter.

226. The crime of a conspiracy to commit atrocities is a violation of international law that rests "on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the United States Supreme Court has] recognized."[78] Conspiracy to engage in atrocities was one of the chief crimes prosecuted at Nuremberg, and that Tribunal rejected Nazi attempts to claim vagueness with respect to the specific, definitive, and obligatory nature of this crime.

227. Plaintiffs are aware of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) in which the Supreme Court held that the application of ATS on human right violation committed in overseas is restricted, unless there is a strong connection to the United States.

228. Plaintiffs submit that *Kiobel* is distinguishable in this case in that (1) the Defendants' conduct substantially and adversely affects an important American national interest, and  (2)  this claim touches and concerns the territory of the United States with sufficient force to displace the presumption against extraterritorial application, and (3) active presence of Defendants including Defendant JAPAN, Corporation Defendants, and Defendant SANKEI in the U.S. is much more than "mere presence."

229. The Defendants, by engaging in a conspiracy to commit the crime of

---

[78] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004).

aggression, were the but-for and proximate cause of Plaintiff's damages (and others like her) in the form of property loss, physical pain, shame, humiliation, degradation and emotional stress, entitling her to damages in an amount to be determined at trial.

230. As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs have been subjected to severe physical and psychological injuries and have incurred expenses and suffered damages. These injuries have caused and will continue to cause Plaintiffs great physical and mental pain and suffering.

231. Plaintiffs are informed and believe and thereon allege that the wartime Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against the Defendants.

232. Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages.

## COUNT FOUR

**(Aiding and Abetting Against All Corporation Defendants, Individual Defendants, Defendant Abe, Defendant SANKEI and Defendants, DOES 1-1000)**

233. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

234. Plaintiffs bring this claim against all Corporation Defendants, Individual Defendants, Defendant ABE, Defendant SANKEI and Defendants Does 1-1000.

235. The common law as well as the Torture Victim Protection Act cre

ates a cause of action relating to the Defendants act of aiding and abetting tor ture.

236. The element of aiding and abetting a principal's wrongful act are met when the aider and abettor (1) carries out acts that have a substantial effect on the perpetration of a specific crime, and (2) acts with the specific intent (i.e., for the purpose) of substantially assisting the commission of that crime.[79]

237. In the present case, the Corporation Defendants, Individual Defendants , Defendant ABE, Defendant SANKEI either provided supplies, tools, equipment, material support, moral support and various types of assistances and other necessary means by which to carry out or justify sex slavery . The Corporation Defendants' logistical support and other assistance generally furthered the Defendant Japan's ability to continue using forced sex slavery.

238. The Defendants' such conduct "specifically directed" to assist or encourage "the perpetration of a specific crime of sex slavery," and that the Defendants' conduct had a "substantial effect" on the specific crimes of forced sex slavery, child labor, torture, and cruel, inhuman, and degrading treatment.

239. That is the type of conduct that gives rise to aiding and abetting liability under international law—conduct that has a substantial effect on the particular criminal act by Wartime Defendant.[80]

---

[79] See *P Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, at 259 (2d Cir.2009).

[80] *Prosecutor v. Vasiljevic*, No. IT–98–32–A, , at ¶¶ 41, 133–34  (ICTY Appeals Chamber, Feb. 25, 2004).

240. The fact proves that the Defendants JAPAN as well as other Corporation Defendants and Individual Defendants knew or should have known the unlawful nature of the transportation, internment, sexual atrocities but the Defendants ignored the plights of Plaintiffs and pushed plaintiffs in the horrible pit of sex slavery.

241. Defendant ABE, Defendant SANKEI and Defendants 1-1000 have consistently expressing support or justification on the crimes of humanity committed against Plaintiffs posing imminent threat to life, body and property of Plaintiffs in the U.S. , Japan and other counties.

242. As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs have been subjected to severe physical and psychological pain and suffering and have incurred expenses and suffered damages. These injuries have caused and will continue to cause Plaintiffs great physical and mental pain and suffering.

243. Plaintiffs are informed and believe and thereon allege that the Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of  Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against the Defendants.

244. Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages.

## COUNT FIVE

## (Defamation Against Defendant Abe, Defendant SANKEI and Defendants, DOES 1-1000)

245. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

246. Plaintiffs bring this claim against Defendant Abe, Defendant SANKEI and Defendants, DOES 1-1000.

247. The Defendants' statements and publications described herein ("Statements") concerned Plaintiffs and were false.

248. The display, publication, distribution, transmission and republication of the Defendants' Statements proximately caused general and special damages to Plaintiffs.

249. Plaintiffs are informed and believe and thereon allege that Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against Defendants.

250. The Defendants knew, anticipated, foresaw, and intended that the Statements would be read, accessed, and viewed by persons throughout the United States and the world and would damage the reputation of the Plaintiff.

251. The Statements, individually and collectively, referred to herein have caused, are causing, and will cause Plaintiffs to suffer serious injury to their personal integrity, to their reputation and good name; and, they have actually held and will continue to hold Plaintiffs up to public scandal and ridicule. The Statements were calculated to, and do, expose Plaintiff to public scorn, hatred, and ridicule.

252. By such published Statements, Defendants did injure the Plaintiff's

reputation within their private circles and in the community at large.

253. Defendants' acts described herein constitute the tort of defamation in violation of the federal laws of the United States.

254. The Statements have proximately caused and been causing

Plaintiffs emotional and psychological trauma, pain and suffering  including, but not limited to, hypersomnia, insomnia, recurring nightmares, anxiety attacks, depression, and headaches requiring prescription medication and counseling which is continuing.

## COUNT FIVE

### (Intentional Infliction of Emotional Distress Against All Defendants)

255. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

256. Plaintiffs bring this claim against all Defendants.

257. All Defendants engaged in, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Plaintiffs.

258. Defendants' acts described herein constitute the tort of intentional infliction of emotional distress in violation of the federal laws of the United States.

259. The publication and republication of the Statements proximately caused
general and special damages to Plaintiff. Defendants knew, anticipated, foresaw, and
intended that the Statements would be read accessed, and viewed by persons throughout the United States and the world and would damage the reputation of the Plaintiff.

260. As a direct and proximate result of Defendants' continuous conducts and omissions, Plaintiffs have been subjected to severe physical and psychological pain and suffering  hypersomnia, insomnia, recurring nightmares, anxiety attacks, depression, and headaches requiring prescription

medication and counseling and have incurred expenses and suffered damages.

261. The statute of limitation should be tolled for the torts of intentional infliction of emotional distress committed by Wartime Defendants because the Defendants have been fraudulently concealed  or manipulated the evidences by systemic, organized and   on-going misleading or misrepresenting the facts.

262. Alternatively, the statute of limitation should not be an issue for the torts of  intentional infliction of emotional distress committed by Defendant JAPAN, Defendant ABE, Defendant SANKEI and Defendants, DOES 1-1000 because the tort is being committed currently.

263. As the direct and proximate result of the conduct of the Defendants' such conducts, Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages. Plaintiffs are informed and believe and thereon allege that Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against All Defendants.

264. The statute of limitation should be tolled for the torts of intentional infliction of emotional distress committed by Wartime Defendants because the Defendants have been fraudulently concealed  or manipulated the evidences by systemic, organized and on-going misleading or misrepresenting the facts.

## COUNT SIX
### (Battery Against Wartime Defendants)

265. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

266. Plaintiffs bring this claim against Wartime Defendants.

267. Wartime Defendants, and each of them, and their officers, agents, servants, employees, representatives, and all persons acting in concert with, at the direction of, in combination with or participating with them and other persons subject to their authority or control acted intentionally and affirmatively when Plaintiffs were sexually molested, beaten, raped, tortured, mutilated, or even murdered in the comfort stations.

268. Defendants' acts described herein constitute the tort of battery in violation of the federal laws of the United States.

269. As the direct and proximate result of the conduct of the , Plaintiffs have suffered severe physical and psychological pain and suffering, and are entitled to monetary damages. Plaintiffs are informed and believe and thereon allege that the Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against Defendants.

270. The statute of limitation should be tolled for the torts of battery committed by Wartime Defendants because the Defendants have been fraudulently concealed or manipulated the evidences by systemic, organized and on-going misleading or misrepresenting the facts.

## COUNT SEVEN

## (Racketeer Influenced & Corrupt Organizations Act Against All Defendants)

271. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs 1-199 as if set forth fully herein.

272. Plaintiffs bring this claim against all Defendants.

273. Defendants' acts described herein constitute racketeering activity in violation of the Racketeer Influenced & Corrupt Organizations Act.

274. Defendants have violated the provisions 18 USC §1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise or

enterprises, through a pattern of racketeering activity, as further set forth with the

required specificity under each separate count.

275. Plaintiffs and each member of the purported class are "persons" as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

276. The Defendants formed "Enterprise " although not a legal entity, in relation with kidnap, slavery, trafficking, and sexual exploitation of Plaintiffs.

277. Each of the Defendants voluntarily, agreed to, and did, participate, or acting in concert in the conduct of the Enterprise, and carried out their roles using broad and independent direction with common purpose.

278. The Wartime Defendants are liable for said conduct in that the Defendants, acting under color of law and authority as Japanese officials, set the conditions for, committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated the war-time sex slavery on Plaintiffs, without Plaintiffs' consent, causing Plaintiffs to be subjected to perform sexual labor to Japanese soldiers against their will and forced the Plaintiffs to continue the slave-like performance by way of threat

of beating, starvation, and summary execution , throughout the time of the slavery.

279. The Enterprise formed by the Defendants was engaged in, and its activities affected, interstate commerce of the United States. The proceeds of the Enterprise were distributed to its participants, including corporate Defendants.

280. Plaintiffs are persons directly or indirectly injured by conduct in violation of sections under RICO or a conspiracy to violate that section.

281. Defendant JAPAN, Corporation Defendants as well as Individual Defendants ,collaborated with each other under the leadership of Japanese government, participated and acted in concert in the systemic process of kidnapping, deportation, detention and sex slavery of Plaintiffs.

282. The Defendants' pattern of racketeering activity has continued and escalated for more than 4 years.

283. The Defendants' such conduct s were necessary or helpful to the operation of the Enterprise directly or indirectly.

284. Japanese soldiers who abused and raped Plaintiffs disrupted the maritime transportation of the U.S. corporations during the War. As a direct and proximate result of Defendants' unconstitutional acts and omissions, the inter-state commerce of the United States was severely affected.

285. Defendant JAPAN, Corporation Defendants as well as Individual Defendants, by and through their agents, are associated in fact, and therefore engaged in at least two acts of racketeering activity by committing numerous counts.        286. Especially, Corporation Defendants reaped significant amount of monetary gains due to the sexual exploitation against the Plaintiffs.

287. Further, another Enterprise of today set up by Defendants such as Defendant ABE Defendant SANKEI is engaging in a series of conducts

affecting the interstate commerce of the U.S. The Defendants are acting in concert with each other and participated in, either directly or indirectly, in the conduct or the affairs of the enterprise.

288. Defendants' pattern of racketeering activity has continued and escalated

for more than 4 years, and continues through the present day.

289. Due to the heinous conducts by the Defendants, Plaintiffs have been subjected to severe physical and psychological pain and suffering and have incurred expenses and suffered damages. These injuries have caused and will continue to cause Plaintiffs great physical and mental pain and suffering.

290. Plaintiffs are informed and believe and thereon allege that Defendants' aforementioned acts were intentional, willful, malicious, oppressive and despicable, and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages against Defendants.

291. Plaintiffs have suffered severe property, physical and psychological loss, pain and suffering, and are entitled to monetary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, on all alleged claims, as follows:

1. For a declaration that Japanese government violated the U.S. laws, international treaties and customary laws by planning, enforcing, and managing sex slave stations during and before the War.

2. For a declaration that Defendant HIROHITO and Defendant KISHI are war criminals and were liable for wrongful conducts including war crimes and crimes against humanity.

3. For an order finding that Wartime Defendants conspired to, planned and committed the crime against humanity against Plaintiffs.

4. For an order finding that Defendant ABE , Defendant SANKEI and Defendant 1-1000 conspired to, planned and committed aiding and abetting of crime against humanity against Plaintiffs.

5. For an award of compensatory damages against all Defendants in an amount of  ten million dollars per Plaintiff to compensate Plaintiff and all victims of sex slave atrocities for damages they sustained as a result of Defendants'  illegal actions in planning and mounting an atrocities.

6. To the extent that Defendants' assets do not cover damages of the Plaintiffs, Defendants set up, manage and obtain other funding at their expense a restitution fund to provide for proper compensation to any and all sex slaves who suffered because of  Defendants' commission or participation of  the wrongful conducts including the crime against humanity.

7. For an award of exemplary and punitive damages against all Defendants in an amount of  ten million dollars per Plaintiff to punish and set an example of them in their unconscionable conduct in planning and committing the wrongful conducts including crime against humanity in violation of  the U.S. laws as well as international treaties and assurances.

8. For an order awarding Plaintiff's costs of suit, including attorney fees as well as litigation expenses (such as costs for depositions and experts), photocopying expenses, and filing fees in an amount which this Court deems just, equitable and proper.

9. For prejudgment interest at the prevailing legal rate.

10. That a permanent injunction restraining the Defendants, and each of them, and their officers, agents, servants, employees, representatives, and all persons acting in concert with, at the direction of, in combination with or

participating with them and other persons subject to their authority or control from displaying, distributing, transmitting or otherwise publication of defaming or false statements against Plaintiffs.

     11. Such other and further relief as this court deems just, equitable and proper

## **TRIAL BY JURY DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  July 13, 2015

 

          Respectfully submitted,

          By __/s/

          *Hyung Jin Kim*

          Attorney for Lead Plaintiff