IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HE NAM YOU and KYUNG SOON KIM, for themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAPAN; HIROHITO; AKIHITO; NOBUSKE KISHI; SHINZO ABE; NYK LINE (NORTH AMERICA); NIPPON YUSEN KABUSHIKI KAISHA; NISSAN MOTOR CO., LTD.; NISSAN NORTH AMERICA, INC.; TOYOTA MOTOR CORPORATION; TOYOTA MOTOR SALES, U.S.A., INC.; HITACHI, LTD.; HITACHI AMERICA, LTD.; NIPPON STEEL & SUMITOMO METAL U.S.A., INC.; NIPPON STEEL & SUMITOMO METAL CORPORATION; MITSUBISHI CORPORATION (AMERICA); MITSUBISHI GROUP; MITSUI & CO. (U.S.A.), INC.; MITSUI & CO. LTD.; OKAMOTO INDUSTRIES, INC.; SANKEI SHIMBUN, CO., LTD.; and DOES 1–1000, inclusive,<br><br>Defendants. | No. C 15-03257 WHA<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND GRANTING IN PART NISSAN NORTH AMERICA'S MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this putative class action for personal injury and crimes against humanity during the Second World War, six of twenty defendants move to dismiss all claims against them. One defendant also moves for summary judgment. Plaintiffs seek leave to file a second amended complaint, following a prior order granting another defendant's motion to dismiss. To the extent stated below, defendants' motions to dismiss are **GRANTED**. The motion for summary judgment is **GRANTED IN PART**.

**STATEMENT**

Plaintiffs He Nam You and Kyung Soon Kim are residents and citizens of the Republic of Korea. Plaintiffs allege that they were abducted by the Japanese government during the Second World War, forced into servitude, and exploited as sex slaves for the benefit of Japanese soldiers at "comfort stations" in Japan.

Plaintiffs bring claims against five overlapping categories of defendants, which they refer to as "wartime defendants," "corporation defendants," "headquarter defendants," "subsidiary defendants," and "individual defendants." Defendants Mitsubishi Corporation (Americas), Toyota Motor Sales, U.S.A., Inc., Nippon Steel & Sumitomo Metal U.S.A., Inc., Nissan North America, Inc., and NYK Line (North America), Inc., and Hitachi America, Inc. (collectively, "moving defendants"), are each identified as members of the wartime, corporation, and subsidiary categories. Each of these six defendants is the United States subsidiary of a parent company based in Japan. None of the parent companies has yet been served.[1]

Without specifying whether they are referring to the parent or the subsidiary, plaintiffs allege that each of the moving defendants provided war matériel to Japan during the Second World War and that each realized "huge profit" from such conduct. Specifically, plaintiffs allege that Nissan and Toyota each provided motor vehicles and trucks, Nippon sold steel, NYK Line provided maritime shipping services, Mitsubishi provided financial support, vessels, trucks, ammunition, and arms, and Hitachi provided locomotives and engines (Amd. Compl. ¶¶ 41–46). Such conduct, plaintiffs allege, aided and abetted the Japanese military in committing the atrocities that form the basis of their claims, both by facilitating plaintiffs' transportation throughout the campaign and by providing general support to the war effort.

Two defendants, Mitsui & Co. (U.S.A.), Inc., and Sankei Shimbun Co., Ltd., have already successfully moved to dismiss (Dkt. Nos. 76, 122). Plaintiffs repeat the same claims

---

[1] With this order, the claims against all of the United States subsidiaries named in this action have been dismissed. The claims against the only foreign defendant that has been served, Sankei Shimbun, have also been dismissed, although plaintiffs' motion for leave to conduct jurisdictional discovery with regard to Sankei Shimbun remains pending (Dkt. No. 134). An order set the deadline for plaintiffs to serve the remaining foreign defendants, Japan, Hirohito, Akihito, Nobuske Kishi, and Shinzo Abe as May 13, 2016 (Dkt. No. 123).

2

against the moving defendants, and the relevant factual allegations overlap significantly. Specifically, plaintiffs assert the following claims against each of the moving defendants: (1) crimes against humanity in violation of the Alien Torts Statute, (2) cruel, inhuman, or degrading treatment in violation of the Alien Torts Statute, (3) conspiracy to commit crimes against humanity in violation of the Alien Torts Statute, (4) aiding and abetting torture, in violation of the Torture Victim Protection Act of 1991, (5) intentional infliction of emotional distress, (6) battery, and (7) violation of the Racketeer Influenced and Corrupt Organizations Act. Mitsubishi, Nissan, Nippon, NYK, Toyota, and Hitachi all move to dismiss all claims against them. Nissan also moves for summary judgment, arguing that because it did not exist at the time of the Second World War, it cannot be liable for its parent company's conduct during the War (the other five defendants assert the same argument in their motions to dismiss).

This order follows full briefing and oral argument.

**ANALYSIS**

The order dismissing plaintiffs' claims against Mitsui held that this case presented a non-justiciable political question and plaintiffs' claims were time-barred (Dkt. No. 76). Each moving defendant now reasserts those arguments and further argues they cannot be held liable for the torts of their parent company. These issues are addressed in turn.

**1.    NON-JUSTICIABLE POLITICAL QUESTION.**

A case presents a non-justiciable political question if it "revolve[s] around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 (1986).

In 1951, Japan entered into a treaty of peace with the Allied Powers. 3 U.S.T. 3169, T.I.A.S. No. 2490 (1951). Article 14 of the 1951 Treaty required Japan to pay certain reparations to the Allied Powers "for the damage and suffering caused by it during the war." Additionally, the 1951 Treaty included a waiver of all "claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war." Article 26 of the 1951 Treaty obligated Japan to enter into "bilateral"

3

1 treaties with non-Allied states "on the same or substantially the same terms as are provided for
2 in the present treaty." In 1965, Japan entered into a treaty with the Republic of Korea.
3 (The United States was not a party to the 1965 Treaty.) Section 1 of Article II of the 1965
4 Treaty "settled completely and finally" all claims between the parties and their nationals,
5 including those addressed in the 1951 Treaty. 583 U.N.T.S. 258, 260 (1965).

6 In *Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), citizens of Korea, among others, brought
7 claims against Japan based on allegations that they were kept as comfort women for Japanese
8 soldiers during the Second World War, similar to our plaintiffs. The D.C. Circuit dismissed the
9 case because it presented a non-justiciable political question. There, the plaintiffs argued that
10 the 1951 Treaty with Japan only waived claims by *Americans* against Japan and its nationals,
11 not claims by citizens of other non-party nations. They also argued that Korea believed its
12 citizens' claims against Japan and its nationals survived the 1965 Treaty.

13 The United States submitted a statement of interest during the district court proceedings
14 in *Joo*, noting that "it manifestly was not the intent of the President and Congress to preclude
15 Americans from bringing their war-related claims against Japan . . . while allowing federal or
16 state courts to serve as a venue for the litigation of similar claims by non-U.S. nationals." *Id.*
17 at 50 (citing Statement of Interest of the United States, dated Apr. 27, 2001, at 28).
18 Additionally, the decision in *Joo* noted that Article 26 of the 1951 Treaty made it "pellucidly
19 clear" that the United States intended the claims of citizens of other nations to be resolved in
20 bilateral treaties, not by domestic courts. As to the 1965 Treaty, it was "[d]ecidedly not" the
21 "province of a court in the United States to decide whether Korea's or Japan's reading of the
22 treaty between them is correct, when the Executive has determined that choosing between the
23 interests of two foreign states would adversely affect the foreign relations of the United
24 States . . . ." *Id.* at 53.[2]

---

[2] In a dictum in *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), our court of appeals addressed the effect of the 1951 Treaty on claims of foreign nationals:

> It is immaterial that many of the Appellants are nationals of two nations, China and Korea, that were not signatories of the San Francisco treaty. When the United States has been a party to a war, the resolution it establishes to that war is

4

1   In light of the 2001 statement of interest submitted by the United States, *Joo* held as
2   follows:

> [A]djudication by a domestic court not only "would undo" a settled foreign policy of state-to-state negotiation with Japan, but also could disrupt Japan's "delicate" relations with China and Korea, thereby creating "serious implications for stability in the region."

*Id.* at 52 (quoting 2001 Statement of Interest at 34–35). Ultimately, because the plaintiffs' claims would have required the *Joo* court to resolve competing interpretations of a treaty between Korea and Japan, the case was dismissed as a non-justiciable political question.

Although the moving defendants are all American entities, plaintiffs' claims against them are based on the theory that they are alter egos of their respective parent companies, which are Japanese corporations. Even if plaintiffs could establish that the moving defendants can be liable for claims based on their parents' conduct, that begs the question whether those claims (against the parent) were extinguished by the 1965 Treaty between Japan and Korea. That was exactly the question resolved in *Joo*. Although *Joo* is not binding in our circuit, it remains the only appellate authority on point, and this order, like the order granting Mitsui's motion to dismiss, adopts its thorough reasoning, which was informed by the position of the United States.

Plaintiffs now make several arguments they had not raised in response to Mitsui's motion to dismiss, but none is persuasive.

Plaintiffs cite *Jeong v. Onoda Cement Co., Ltd.*, No. BC217805, 2001 WL 1772750 (Cal. Super. Ct. Sept. 14, 2001) (Judge Peter Lichtman), in which a Korean man brought claims seeking compensation for his work at a Japanese labor camp during the Second World War under Section 354.6 of the California Code of Civil Procedure. Section 354.6 provided a remedy and a special statute of limitations specifically for victims of forced labor during the Second World War. The parties, as here, presented competing interpretations of the 1965 Treaty between Japan and Korea. Nevertheless, that decision held that in the absence of an applicable treaty negotiated and ratified by the United States or any ongoing negotiations

---

the resolution for the whole of the United States. States lack the power to modify that resolution, regardless of the citizenship of those seeking redress.

5

addressing the plaintiff's claims, the case presented a justiciable question. *Id.* at *9. That decision relied in part on a statement of interest from the United States (filed in a separate case in 2000) for the contention that the 1951 Treaty between the United States and Japan did not extinguish the claims of a foreign national against Japan. *Id.* at *7 n.8 (citing Statement of Interest of the United States, dated Dec. 6, 2000, *In re World War II Era Japanese Forced Labor Litigation*, MDL No. 1347 (N.D. Cal. Dec. 13, 2000) (Judge Vaughn R. Walker)).

Plaintiffs rely on *Jeong* and the 2000 statement of interest it references for the contention that the position of the United States on these kinds of claims shifted. The 2000 statement that the 1951 Treaty did not waive the claims of Korean nationals, however, is consistent with the 2001 statement in *Joo*. The 2001 statement noted that the intent of the 1951 Treaty's waiver of Americans' claims against Japan and its nationals also precluded the possibility that "federal or state courts [would] serve as a *venue* for the litigation of similar claims by non-U.S. nationals." *Joo*, 413 F.3d at 50 (quoting 2001 Statement of Interest at 28) (emphasis added).

Indeed, the 2000 statement included a similar statement regarding venue:

> Nor, we believe, should U.S. courts be put in the position of judging the effects of agreements entered into between two foreign governments, such as Japan and China or Korea, on the rights of their citizens with respect to events occurring outside the United States. Any decision as to whether or not the United States should become involved in interpreting such agreements should be made by the Executive Branch after full consideration of the potential diplomatic and political impact on the United States.

The Superior Court in *Jeong* failed to address the above-quoted passage in reaching its conclusion. Even so, that decision carries no persuasive weight — the California Court of Appeal ultimately reversed *Jeong*, holding that Section 354.6, which gave rise to the plaintiff's claims therein, was preempted by the foreign policy embodied in the 1951 Treaty, namely the intent for claims against Japan to be resolved diplomatically. *Taiheiyo Cement Corp. v. Superior Court*, 117 Cal. App. 4th 380, 385 (2004). Thus, plaintiffs' citations actually demonstrate that the United States has maintained a constant position across presidential administrations.

Plaintiffs also argue that the Supreme Court has "sounded the death knell for the 'political question doctrine'" in several recent decisions, but the authorities they cite do not support that position. First, in *Zivotofsky v. Clinton*, 566 U.S. __, 132 S. Ct. 1421, 1427 (2012), the Supreme Court reversed a decision holding that the political question barred judicial review of a statute that permitted people born in Jerusalem to list "Israel" as their birthplace on their passports. The holding in *Zivotofsky* did not, however, undermine the non-justiciability of political questions, but rather held that the lower courts improperly cast the issue as a political question by focusing on the foreign policy implications inherent in the statute, rather than focusing on the legal question of whether Congress unconstitutionally encroached on the Executive Branch's power to oversee foreign affairs by enacting that statute.

Similarly, in *Boumediene v. Bush*, 533 U.S. 723 (2008), the Supreme Court considered whether detainees at Guantanamo Bay had a right to pursue habeas relief. *Boumediene* declined to question the United States' determination of the political question that Cuba held *de jure* sovereignty over the island, but it refused to dismiss as non-justiciable the legal question of whether the constitutional right of habeas corpus applied to the United States' activities at Guantanamo nonetheless. *Boumediene* did not undermine the non-justiciability of political questions, but, like *Zivotofsky*, it carefully identified the line distinguishing between political questions and legal questions.

Plaintiffs also cite *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and *Rasul v. Bush*, 542 U.S. 466 (2005), although neither decision addressed the non-justiciability of political questions at all. Those decisions both considered the constitutional rights available to enemy detainees notwithstanding the implications those decisions could have for foreign and military affairs. Yet again, those decisions addressed only legal and constitutional questions.

At best, plaintiffs' citations show that the mere fact that a case addresses the constitutionality of a political branch's conduct in foreign affairs does not automatically render that case non-justiciable. Those decisions do not undermine the proposition that a genuine political question remains non-justiciable. In the aftermath of war, thousands, even millions, will have suffered or died on a vast scale and treaty-making has necessarily been the time-

7

honored way for resolution of those grievances. War and the resolution of war are classic obligations that must, under our system, be committed solely to the Executive and Legislative Branches. The courts should not upset the balance of adjustments and accommodations negotiated and approved by the other two branches by recognizing rights of action anchored in those grievances independent of treaty.

Finally, plaintiffs argue that even if the 1965 Treaty waived their claims against Japan, such a waiver was an unconstitutional taking. Plainly, the United States Constitution does not bind Korea, so this argument is inapposite. The 1951 Treaty specifically called for Japan to make peace with the non-Allied powers like Korea on substantially the same terms, which it did in the 1965 Treaty. *Compare* 1951 Treaty, Art. 26, 3 U.S.T. 3169, *with* 1965 Treaty, Art. II, Sec. 1, 583 U.N.T.S. 258. The latter treaty and its waiver are fully consistent with the 1951 Treaty.

Accordingly, plaintiffs' claims against the moving defendants must be dismissed, inasmuch as they present non-justiciable political questions. Nevertheless, as in the order dismissing plaintiffs' claims against Mitsui, an additional infirmity in plaintiffs' complaint is worth addressing.

**2.     PLAINTIFFS' CLAIMS ARE TIME-BARRED.**

In the 1965 Treaty, Japan agreed to pay reparations in the form of $300 million in grants of supplies and services to the Republic of Korea and various loans totaling $500 million. In 1993, Japan's then-Chief Cabinet Secretary Yohei Kono issued a formal apology for the role of the Japanese government in the coercive recruitment of comfort women. In 1995, the Japanese government established the Asian Women's Fund, which issued formal written apologies and paid reparations to comfort women. Last month, the heads of both Japan and Korea met at a summit, seeking to restore relations and discuss issues including the atrocities committed against comfort women, and discussions remain ongoing.

The wrongs in question occurred more than seventy years ago. The longest limitations period on any of plaintiffs' claims is ten years, under the Alien Torts Statute. *See Deutsch v. Turner Corp.*, 324 F.3d 692, 716–17 (9th Cir. 2003). Plaintiffs argue that equitable estoppel

8

1  and equitable tolling allow them to circumvent any time bar on their claims against the moving
2  defendants. That argument remains unavailing.

3  "Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations
4  when there is 'active conduct by a defendant, above and beyond the wrongdoing upon which
5  the plaintiff's claim is filed to prevent the plaintiff from suing in time.' The plaintiff must
6  demonstrate that he relied on the defendant's misconduct in failing to file in a timely
7  manner . . . ." *Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2003). Plaintiffs' only
8  allegation relating to fraudulent concealment is that "Defendants including Defendant JAPAN
9  have purposefully and intentionally concealed or manipulated the evidence showing direct
10 control and involvement of the Japanese Government" (Amd. Compl. ¶ 89). That conclusory
11 allegation is not entitled to a presumption of truth on a motion to dismiss and therefore cannot
12 establish fraudulent concealment. Nor do plaintiffs offer any explanation for how Japan's
13 alleged manipulation of evidence prevented plaintiffs from knowing of their claims against any
14 of the defendants here. Moreover, the Japanese government's admission of its role in the
15 recruitment of comfort women occurred in 1993 — still more than a decade beyond the
16 limitations period for any of plaintiffs' claims against the moving defendants (Amd. Compl.
17 ¶ 213).

18 Plaintiffs also allege they are entitled to equitable tolling. "Equitable tolling applies
19 when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the
20 defendant, or when extraordinary circumstances beyond the plaintiff's control made it
21 impossible to file a claim on time." *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999), *as
22 amended* (Mar. 22, 1999). Plaintiffs again rely on Japan's concealment of its involvement in
23 the atrocities committed against comfort women. Again, plaintiffs have made no attempt to
24 demonstrate how Japan's conduct prevented them from asserting their claims, and even so, that
25 argument offers no basis for tolling the limitations period against the moving defendants.

26 Plaintiffs now argue that the limitations periods on their claims are tolled by the 1968
27 Convention for the Non-Applicability of a Statute of Limitations for War Crimes and Crimes
28 Against Humanity, Nov. 26, 1968, 754 U.N.T.S. 73. Plaintiffs acknowledge that neither the

United States nor Japan is a party to that treaty, but they contend "it has gained the status of customary international law " (Pls.' Opp. at 17–18). Plaintiffs offer no authority to support that position. The treaty is not the law of the United States and does not apply to plaintiffs' claims here.[3]

Plaintiffs also contend (Pls.' Opp. at 21):

> Further, even though the statute of limitations under the ATCA is 10 years, under California choice of law principles, decades-old tort claims asserted by victims subjected to slave labor by Nazis and their allies and sympathizers during Second World War were NOT time-barred pursuant to California statute of limitations, if plaintiffs can show that any foreign state has a strong interest in keeping such claims alive.

Plaintiffs do not cite authority for that position. Their argument appears to be paraphrased from a WestLaw headnote on the decision in *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), itself a paraphrase of the holding.

In *Deutsch*, citizens of numerous foreign nations brought claims against German and Japanese corporations and their American subsidiaries (including three of our defendants), alleging the parent corporations forced them to work as slave laborers during the Second World War. That decision applied California's "governmental interest" approach to conflict-of-law issues and noted that "where the conflict concerns a statute of limitations, the governmental approach generally leads California courts to apply California law and especially so where California's statute would bar a claim." *Id.* at 716–17 (internal citations omitted). This is because a "a state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.' Hence, subject to rare exceptions, the forum will dismiss a claim that is barred by its statute of limitations." *Id*. at 717 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142, cmt. f (1988)). Thus, "only an extraordinarily strong interest of a foreign state in keeping these claims alive could overcome the presumption that California will not hear claims that have been stale for so long under its own law. No such strong foreign interest has been demonstrated here." *Ibid.*

---

[3] Plaintiffs also cite numerous decisions from Japanese trial courts that apparently set aside statutes of limitations for claims arising out of the Second World War, although they have failed to provide the Court with copies of those decisions. Those decisions are also not the law of the United States, and do not apply here.

10

1  Nor here. As in *Deutsch*, our plaintiffs bring claims arising out of atrocities committed
2  during the Second World War. Korea has the same interest in preserving our plaintiffs' claims
3  as the home nations of the plaintiffs in *Deutsch*, which our court of appeals held did not justify
4  applying a foreign statute of limitations. Although counsel for plaintiffs noted at oral argument
5  that Korea had no statute of limitations for these claims, that does not change the analysis —
6  California choice-of-law principles compel the application of the relevant California and federal
7  statutes of limitations here.

Plaintiffs have failed to overcome the time bar on their claims, and accordingly, their claims against the moving defendants must be **DISMISSED**.

### 3. VEIL PIERCING AND ALTER EGO.

None of the moving defendants existed during the Second World War. Each is an American subsidiary formed after the War.[4] Accordingly, each moving defendant argues that plaintiffs lack standing under Article III inasmuch as their injuries cannot be fairly traced to defendants that did not exist at the time of their injuries. Plaintiffs have never disputed that the subsidiary defendants only came into existence after the Second World War ended.[5] Nevertheless, plaintiffs seek to hold the moving defendants liable for their parents' conduct during the war based on an variant of alter ego theories of liability that has become known as "outside reverse piercing" of the corporate veil.

Outside reverse piercing occurs when a plaintiff that is not a shareholder (an outsider) seeks to reach the assets of a subsidiary based on a parent's liability (the reverse of traditional

---

[4] In resolving a motion to dismiss for lack of Article III standing, the Court may consider "evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." *Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Judicial notice is taken of the certificates of incorporation of each defendant as public documents "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Nippon Steel & Sumitomo Metal (U.S.A.), Inc., incorporated in 1972 (Cullen Decl., Exh. A). Toyota Motor Sales, U.S.A., Inc., incorporated in 1957 (Toyota Request for Judicial Notice, Exh. 1). Mitsubishi Corporation (Americas) incorporated in 2012 (Wallach Decl., Exh. 1). NYK Line (North America), Inc., incorporated in 1988 (Lee Decl., Exh. 1). Judicial notice is also taken of the records of the California Secretary of State that show that Nissan North America, Inc., incorporated in 1960 (McPherson Decl., Exh. A).

[5] Moreover, plaintiffs failed to provide any evidence to dispute the evidence set forth in Nissan's motion for summary judgment on this issue or an affidavit explaining why plaintiffs could not present such evidence at this stage as required by Rule 56(d).

11

veil piercing, which seeks to reach the assets of a parent for the liability of its subsidiary). "We apply the law of the forum state in determining whether a corporation is an alter ego of an individual." *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (quoting *Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993)). The decision in *S.E.C. v. Hickey* did not expressly address whether we apply the law of the forum state with regard to alter ego liability to claims under federal law; however, inasmuch as that case involved only violations of federal securities laws, it necessarily stands for the proposition that we apply the alter ego law of the forum state with regard to federal claims.

The California Court of Appeal explicitly rejected the use of outside reverse piercing as a basis for liability in *Postal Instant Press, Inc. v. Kaswa*, 162 Cal. App. 4th 1510, 1523 (2008). *Postal Instant* noted that outside reverse piercing did not address the issue met by traditional veil piercing, namely, a shareholder's misuse of the corporate form to avoid personal liability. Rather, outside reverse piercing addressed a shareholder's use of a corporate form to shield assets from collection by a creditor. *Postal Instant* held that the remedies of conversion and fraudulent conveyance, *inter alia*, provided adequate and less-invasive remedies for judgment creditors seeking to reach a shareholder's assets.

Notwithstanding the potential for abuse that California's prohibition on outside reverse piercing presents, our court of appeals has applied that prohibition faithfully in the context of corporate relationships, although it has not endorsed the reasoning behind it. *See United States v. Kim*, 797 F.3d 696 (9th Cir. 2015), *amended by* 2015 WL 7739871 (Nov. 30, 2015); *FG Hemisphere Associates, LLC v. Unocal Corp.*, 560 Fed. Appx. 672, 673 (9th Cir. 2014); *United States v. One Hundred Thirty-Three (133) U.S. Postal Service Money Orders*, 496 Fed. Appx. 723, 725 (9th Cir. 2012). To be sure, it declined to expand the prohibition on outside reverse piercing to the context of trusts. *See In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010). Nevertheless, this order must apply California's prohibition on outside reverse piercing and conclude that plaintiffs' theory of liability for the moving defendants has been explicitly rejected as a matter of law.

**4. POTENTIAL AMENDMENTS.**

After Mitsui first moved to dismiss, plaintiffs amended their complaint to add their alter ego theories (Dkt. No. 22). An order denied Mitsui's motion to dismiss as moot (Dkt. No. 24). Mitsui again moved to dismiss and raised each of the arguments addressed above as well as several arguments regarding the substance of plaintiffs' claims (Dkt. No. 32). The order granting Mitsui's motion to dismiss invited plaintiffs to seek leave to amend their complaint following Mitsui's motion to dismiss, and to "plead their best case for *all* arguments" that Mitsui raised, not just those raised in the order (Dkt. No. 76). Plaintiffs have moved for leave to file a second amended complaint, which remains pending (Dkt. No. 127). That motion is scheduled for a hearing on **JANUARY 14, 2016**.

Before the Court rules on the pending motion to amend, plaintiffs shall have a further opportunity to seek leave to file an amended complaint to take account of the rulings in this order. If they so choose, plaintiffs may file an updated motion for leave to amend their complaint by **DECEMBER 28, 2015**. Plaintiffs should plead their best case for *all* arguments raised in defendants' respective motions, not only those addressed herein. All defendants should respond to plaintiffs' motion to amend by **JANUARY 6, 2016**. The hearing will remain on **JANUARY 14, 2016**.

## CONCLUSION

For the reasons stated above, plaintiffs' claims against Mitsubishi Corporation (Americas), Toyota Motor Sales, U.S.A., Inc., Nippon Steel & Sumitomo Metal U.S.A., Inc., Nissan North America, Inc., and NYK Line (North America), Inc., and Hitachi America, Inc., are hereby **DISMISSED**. Nissan's further motion for summary judgment is **GRANTED IN PART**. Plaintiffs' updated motion for leave to amend, if any, is due **DECEMBER 28, 2015**. Responses are due **JANUARY 6, 2016**, to be heard **JANUARY 14, 2016**.

**IT IS SO ORDERED.**

Dated: December 14, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13